[Nos. B196045, B201425. Second Dist., Div. Three. Sept. 22, 2010.]

DAFNA UZYEL et al., Plaintiffs and Respondents, v.
NEIL KADISHA, as Trustee, etc., Defendant and Appellant.

[Nos. B198007, B203804. Second Dist., Div. Three. Sept. 22, 2010.]

DAFNA UZYEL et al., Plaintiffs and Appellants, v.
NEIL KADISHA, as Trustee, etc., Defendant and Appellant.

[No. B199850. Second Dist., Div. Three. Sept. 22, 2010.]

DAFNA UZYEL et al., Plaintiffs and Appellants, v.
NEIL KADISHA, as Trustee, etc., Defendant and Respondent.

876

## COUNSEL

Akin Gump Strauss Hauer & Feld, Rex S. Heinke, Hyongsoon Kim, Orly Degani, Katharine J. Galston, Scott J. Street; Krane & Smith, Samuel Krane and Marc Smith for Plaintiffs and Appellants and for Plaintiffs and Respondents.

Sonnenschein Nath & Rosenthal, Bernard J. Nussbaum, John E. Walker; Howard Rice Nemerovski Canady Falk & Rabkin, Jerome B. Falk, Jr., Douglas A. Winthrop, John P. Duchemin, Simona A. Agnolucci; Horvitz & Levy, Ellis J. Horvitz, S. Thomas Todd, Mitchell C. Tilner; Morrison & Foerster, Miriam A. Vogel, Sean P. Gates and Benjamin J. Fox for Defendant and Appellant and for Defendant and Respondent.

## OPINION

**CROSKEY, J.**—Neil Kadisha served as the trustee of two trusts. The beneficiaries, Dafna Uzyel and her children Izzet and Joelle Uzyel (collectively the Uzyels), filed petitions for breach of trust against Kadisha and

terminated the trusts. After a nonjury trial, the trial court awarded the Uzyels over $59 million in compensatory damages and disgorgement of profits, plus $5 million in punitive damages and over $13 million in attorney fees. Kadisha appeals the judgment, challenging the awards on several claims, the punitive damages, and the attorney fee award. The Uzyels also appeal, challenging the denial of relief on some of their claims, the denial of prejudgment interest on some claims, the punitive damages, and the costs award.

These consolidated appeals raise several questions concerning a trustee's liability for breach of trust under Probate Code section 16440, subdivision (a).[1] With respect to these questions, we conclude as follows: (1) tracing is not required for the disgorgement of profits made by the trustee "through the breach of trust" under section 16440, subdivision (a)(2); (2) the fact that an act is consistent with or even compelled by the duty of prudent investing does not excuse a trustee from liability for breach of the duty of loyalty, including liability for appreciation damages as lost profits under section 16440, subdivision (a)(3); (3) the determination as to which of the statutory measures of liability "is appropriate under the circumstances" under section 16440, subdivision (a) is reviewed for abuse of discretion; (4) an investment loss resulting from a breach of trust should be offset against a profit resulting from a breach of trust only if the breaches were not separate and distinct; (5) prejudgment interest is mandatory on an award of damages under section 16440, subdivision (a)(1); and (6) the absence of an express provision for prejudgment interest under section 16440, subdivision (a)(3) does not preclude an award of prejudgment interest under Civil Code section 3287, subdivision (a) on damages awarded under that provision.

In addition, with respect to two other issues, we conclude that a plaintiff is not entitled to the reversal of a punitive damages award for redetermination of the amount of punitive damages just because the compensatory award is increased on appeal; and "reasonable cause" to oppose a contest of an account, within the meaning of section 17211, subdivision (b), means an objectively reasonable belief, based on the facts then known to the trustee, either that the claims are legally or factually unfounded or that the petitioner is not entitled to the requested remedies.

In light of these conclusions and, after determining that (1) the trial court had no jurisdiction to vacate the modification of its statement of decision and judgment, (2) the award of damages resulting from Kadisha's use of trust funds to pay for his legal defense included excessive prejudgment interest, (3) the denial of prejudgment interest on the amounts awarded on some of the Uzyels' claims was error, and (4) the award of attorney fees to the Uzyels

---

[1] All statutory references are to the Probate Code unless otherwise indicated.

was unauthorized, we will reverse the judgment in part, with directions, and reverse the order awarding attorney fees. In all other respects, however, the judgment will be affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. Establishment of the Trusts

Rafael Uzyel died intestate in May 1986, survived by his wife Dafna Uzyel and their young children Izzet and Joelle Uzyel. Dafna Uzyel was 28 years old at the time. She had only a 10th grade education, a very limited ability to communicate in the English language, and no financial or business experience. Kadisha was a family friend. Kadisha lent money to Dafna Uzyel after her husband's death to help pay her substantial living expenses.

Kadisha referred Dafna Uzyel to an attorney, Hugo DeCastro, for assistance in marshaling foreign assets. DeCastro also represented Kadisha or entities in which he was an investor. Rafael Uzyel's sister, Lillian Nomaz, sought to prevent Dafna Uzyel from gaining control of assets in Switzerland. DeCastro represented Dafna Uzyel in connection with the dispute. The Uzyel Irrevocable Trust No. 1 (Trust No. 1) was established in February 1988 to resolve the dispute, with Kadisha as the trustee. Dafna Uzyel was the settlor of the trust, and Izzet and Joelle Uzyel were the beneficiaries.

A second trust, the Uzyel Irrevocable Trust No. 2 (Trust No. 2) was established contemporaneously with Trust No. 1, with Kadisha as the trustee. Dafna Uzyel was the settlor of the trust and was its sole beneficiary. Dafna Uzyel conveyed the Uzyels' personal residence and other assets to Trust No. 2.

### 2. Namco Loan

The trusts initially had no liquid assets. Kadisha, as trustee of Trust No. 2, borrowed $500,000 from Namco Financial, Inc. (Namco), in May 1988. The short-term loan was secured by the Uzyels' personal residence. Kadisha deposited the loan proceeds in his personal Union Bank checking account and, within three weeks, spent the entire amount for his own purposes rather than for the benefit of the trust or its beneficiaries. He used $240,000 of the loan proceeds to repay his Union Bank line of credit, which he had previously drawn on to lend $151,000 to Leon Farahnik.[2]

---

[2] Kadisha lent a total of $221,000 to Farahnik in February, March, and April 1988. Kadisha's Union Bank line of credit was the source of $151,000 of those loan funds. The other $70,000 came from other sources.

3. *Omninet and the Qualcomm Settlement*

Kadisha was an officer and director of, and an investor in, Omninet Corporation (Omninet). Omninet and Qualcomm Corporation (Qualcomm) were parties to an agreement under which Omninet was obligated to develop communications technology for use with mobile telephones. The agreement provided that Qualcomm would acquire ownership of the intellectual property rights to the technology if Omninet defaulted under the agreement. Omninet was unable to obtain the funds needed to continue its development efforts and served a notice of its default under the agreement in April 1988. Qualcomm filed a complaint against Omninet in June 1988 for breach of the agreement, seeking to acquire the intellectual property rights. The litigation, together with other liabilities and potential liabilities, threatened to bankrupt Omninet.

Kadisha negotiated a settlement with Qualcomm, which was consummated in August 1988. Under the terms of the settlement agreement, Qualcomm acquired certain assets from Omninet; Qualcomm paid Omninet and its investors $4 million in cash, $1 million in promissory notes, and 200,000 shares of stock; and Kadisha and other Omninet investors became Qualcomm directors.[3] The parties to the settlement agreement and others also executed a stock purchase agreement on the same date, pursuant to which Kadisha and others purchased a total of four million shares of Qualcomm stock at $1 per share (and also received warrants to purchase an additional 93,750 shares of stock); in addition, they lent Qualcomm a total of $750,000. Kadisha and others obtained the funds to purchase their portion of the four million shares by borrowing $8.5 million from Sanwa Bank (Sanwa). After payment of another obligation, approximately $3.5 million of the Sanwa loan funds remained for use in connection with the stock purchase and the $750,000 loan.

Kadisha purchased 662,000 shares of Qualcomm stock in August 1988 for himself pursuant to the settlement and purchased an additional 390,000 shares for his friends and family members, who reimbursed him $390,000 within one day. The total of $1,052,000 paid for those stock purchases was drawn from the Sanwa loan funds. The Sanwa loan funds also paid $344,000 of the $750,000 loan to Qualcomm. Kadisha contributed an additional $136,000 toward the $750,000 loan, drawing that amount from his personal Wells Fargo Bank account into which he had deposited the $390,000 that he received in reimbursement from his friends and family. Kadisha's share of the $750,000 loan was $250,000.

Kadisha acknowledged in a declaration filed in other litigation that Qualcomm was "an extremely risky investment" at the time and that it had

---

[3] The settlement also included other consideration that is not relevant to the issues before us.

consistently lost money. Qualcomm continued to experience financial difficulties. Kadisha lent Qualcomm an additional $100,000 in September 1988, at a time when the Namco loan was in default, and received a $350,000 promissory note from Qualcomm for the $100,000 loan and his prior $250,000 loan. In consideration for the making of this loan, Kadisha received warrants for the purchase of 43,750 shares of Qualcomm stock at $8 per share.[4]

### 4. *Imperial Savings Loan*

Kadisha, individually and as trustee of Trust No. 2, borrowed $2 million from Imperial Savings Association (Imperial) in December 1988. The loan was secured by the Uzyels' personal residence. Kadisha used the loan proceeds to repay the Namco loan and took $1 million of the loan proceeds from the trust for his personal use.[5] From the remaining loan proceeds held by Trust No. 2, he made a $300,000 loan from the trust to Qualcomm. Qualcomm provided a promissory note in that amount and warrants for the purchase of 37,500 shares of stock at $8 per share.

Kadisha sold the Uzyels' personal residence for $3,525,000 in May 1989. He used the sale proceeds to repay the Imperial loan and deposited the remaining $1,329,293 in Trust No. 2's account.

### 5. *Trust No. 2's May 1989 Purchase of Qualcomm Stock and Kadisha's Continuing Misappropriations*

Kadisha exchanged Trust No. 2's $300,000 Qualcomm promissory note for 37,500 shares of Qualcomm stock ($8 per share) in May 1989. He took $1.25 million from Trust No. 2 in June 1989. Trust No. 2 received $390,886 from foreign assets in August 1989. That same month, Kadisha then took $390,000 from Trust No. 2.

Kadisha exercised his warrants to purchase 43,750 shares of Qualcomm stock in September 1989, canceling his $350,000 promissory note to pay the purchase price.

Trust No. 1 received $1,738,657 from a Swiss bank in December 1989, and Trust No. 2 received $271,990. Kadisha took $200,000 and then $1.4 million

---

[4] The trial court found that Kadisha received the warrants to purchase 43,750 shares of Qualcomm stock in exchange for the $100,000 loan. Kadisha states that he received the warrants in exchange for his two loans totaling $350,000, but does not expressly challenge the trial court's factual finding.

[5] Kadisha took large sums of money from the trusts for his personal use on several occasions from December 1988 to July 1990. At the time, he provided no promissory note or security for what he later, in backdated documents, characterized as loans. He paid no interest on the purported loans until he repaid the principal, with interest, in the spring of 1992.

from Trust No. 1 in December 1989 and January 1990. He took $130,000 from Trust No. 2 in June 1990 and $150,000 from Trust No. 1 in July 1990.

### 6. *Kadisha's May 1991 Purchase of Qualcomm Stock from Farahnik*

Kadisha purchased 30,000 shares of Qualcomm stock from Farahnik for $7 per share in May 1991. Kadisha paid for the shares by canceling $210,000 of Farahnik's prior $221,000 debt to Kadisha.

Kadisha provided written notice of his resignation as trustee of Trust No. 2 in a letter to Dafna Uzyel dated June 6, 1991. The letter stated that he would continue to serve as trustee only until the end of the year, that he did not believe that he was "capable of fulfilling your wishes with the limitation and authority governing my actions as trustee," and that he was serving as trustee "as favor to you and your family, therefore I receive no compensation or any benefit from this time consuming process." Dafna Uzyel agreed to amend the declaration of trust to induce Kadisha to withdraw his resignation and remain as trustee. She was not represented by counsel in connection with the amendment.[6]

### 7. *Trust No. 2's May 1992 Sale of Qualcomm Stock*

Qualcomm had its initial public offering in December 1991. Kadisha sold Trust No. 2's 37,500 shares of Qualcomm stock in May 1992 at an average price of $21.35 per share, for a total of approximately $801,000. Kadisha also repaid part of his personal "loans" from Trust No. 2 at that time in the amount of $677,776.96. Kadisha as trustee then made a $1.4 million loan from Trust No. 2 to "David Rahban" on May 19, 1992.[7] Rahban was a fictional borrower. The money actually went to Kadisha, who used it to repay $1,471,936.63 that he owed to Trust No. 2 arising from his personal "loans" from the trust.[8]

Kadisha "borrowed" a total of $800,000 from Trust No. 2 in June and July 1992, $500,000 from Trust No. 2 in February 1993, and $500,000 from Trust No. 1 in March 1993.[9]

---

[6] The trial court found that this and other amendments to the declaration of trust purportedly relieving Kadisha of liability for any wrongdoing were unconscionable.

[7] Kadisha as trustee also made a $1.2 million loan from Trust No. 1 to "David Rahban" in April 1992.

[8] The trial court so found, and Kadisha does not challenge those factual findings.

[9] Kadisha provided contemporaneous promissory notes for his personal loans from the trusts beginning in 1992. He eventually fully repaid the trusts for all misappropriated or borrowed funds, with interest.

8. *Trust No. 2's January 1994 Purchase and April 1999 Sale of Qualcomm Stock, and Kadisha's Purchase of Trust No. 2's Interest in Carson '93*

Kadisha exercised Trust No. 2's warrants for the purchase of Qualcomm stock in January 1994. The purchase price of $8 per share was paid by canceling some of the shares based on the previous day's market closing price of $51.50 per share. Trust No. 2's resulting acquisition totaled 31,674 shares. The shares split two for one in February 1994, so Trust No. 2 then owned 63,348 shares. Kadisha as trustee of Trust No. 2 sold 53,348 of those shares in April 1999 at an average price of approximately $200 per share, for a total of $10,593,959. At the same time, he sold 10,000 of Trust No. 2's shares of Qualcomm stock to Trust No. 1, but he backdated the sale to October 8, 1998, and the shares were sold for the market closing price on that date of $39.13. Qualcomm stock split two for one in May 1999.

Kadisha purchased Trust No. 2's interest in Carson '93 Limited Partnership (Carson '93) in January 1997, received cash distributions from the partnership in October 1998 and February 1999, and sold his interest in the partnership in November 2000.

9. *The Uzyels' Request for Additional Distributions*

The Uzyels requested an additional $300,000 in distributions from the two trusts in June 1999. Kadisha distributed only $50,000 from Trust No. 2. An attorney sent a letter to Kadisha in July 1999 stating that the Uzyels had retained his firm regarding their request for distributions and demanding an additional $150,000 distribution. Kadisha did not comply with the demand.

Qualcomm stock split four for one in December 1999 and reached its highest price of $179.31 per share on January 3, 2000.

10. *Petitions for Breach of Trust and Subsequent Events*

Izzet and Joelle Uzyel, by and through Dafna Uzyel as their guardian ad litem, filed a petition against Kadisha as trustee of Trust No. 1 in October 1999. Dafna Uzyel, as settlor of Trust No. 1, and Izzet and Joelle Uzyel, as beneficiaries of the trust, filed an amended petition in July 2000, seeking damages for breach of trust and other relief. Dafna Uzyel filed a petition against Kadisha as trustee of Trust No. 2 in October 1999, and filed an amended petition in July 2000, seeking damages for breach of trust and other relief.

Kadisha deposited a total of $500,000 from the two trusts in his attorney's trust account on February 23, 2000, to pay for his defense in these proceedings. He also paid some of his attorney fees using additional trust funds.

Kadisha used approximately $76,000 of the deposited funds to pay his attorney fees from March to July 2000.

Dafna Uzyel notified Kadisha in writing in June 2000 that the trusts were terminated and directed him to turn over all trust assets to Whittier Trust Company. She petitioned for orders compelling Kadisha to turn over the trust assets. The Uzyels also applied ex parte for a temporary restraining order to prevent Kadisha from spending any of the trust funds held by his attorney. Kadisha objected to the petitions and opposed the ex parte application. The trial court granted temporary restraining orders and later preliminary injunctions prohibiting the use of any trust assets to pay for Kadisha's defense in any trust litigation. On August 4, 2000, the court ordered Kadisha to return the $500,000 held in trust by his attorney and turn over all trust assets to Whittier Trust Company. Kadisha began to turn over the assets in mid-September 2000 and completed the task (with the exception of the $500,000 still held in trust by his attorney) on September 18, 2000.

Kadisha appealed the preliminary injunctions and orders to return the $500,000. He argued on appeal that the preliminary injunctions were invalid because the trial court did not require the Uzyels to provide an undertaking pursuant to Code of Civil Procedure section 529, subdivision (a). At oral argument, the parties stipulated that the disputed funds would remain in the client trust account held by Kadisha's attorney pending the resolution of the trial court proceedings and that no undertaking was required. We modified the appealed orders accordingly and affirmed the orders as modified. (*Levi v. Kadisha* (Sept. 30, 2003, B144534) [nonpub. opn.].) We modified the orders to state, in part, "Pursuant to the stipulation of the parties, the return of $250,000 [to each trust] shall be deemed accomplished as of this date and the funds shall remain on deposit in the bank account of the trustee's attorney, Marvin G. Burns, and no withdrawals or expenditures therefrom may be had except upon the order of this court."

### 11. *Trial and Amended and Consolidated Petition for Breach of Trust*

The trial court consolidated the two proceedings for trial. The nonjury trial commenced in May 2002. The presentation of evidence concluded in July 2004, after approximately 200 full or partial days of trial testimony. The Uzyels filed an amended and consolidated petition in September 2004, with leave of court. The court filed a tentative decision in September 2005, an amended tentative decision in July 2006, and a statement of decision in October 2006.

### 12. *Statement of Decision*

The 191-page statement of decision characterized Kadisha's conduct as trustee as egregious, stating: "Throughout Kadisha's trusteeship, he acted in

bad faith and in total derogation of his fiduciary duties. There can be no doubt that Kadisha knew that what he did was wrong—he did exactly what DeCastro advised him not to do and then tried to cover up his misconduct." "[A]lthough the evidence shows numerous (egregious) instances in which Kadisha used Trust assets or his position as Trustee for his own benefit, there is no evidence of any instances in which Kadisha acted *in the beneficiaries' interests*. In short, Kadisha did precisely the opposite of what the duty of loyalty compelled him to do. Rather than administering the trust and dealing with the trust assets solely for the interest of the beneficiaries, he administered the trust and dealt with the trust assets *solely for his own benefit*." The trial court found that Kadisha had breached his fiduciary duties in many instances, but concluded that the Uzyels were entitled to recover compensatory damages or the disgorgement of profits arising from only five specific events.

The statement of decision stated that the Uzyels were entitled to (1) the disgorgement of $15,818,000 in profits arising from Kadisha's stock purchase from Farahnik in May 1991; (2) $35,389,242 in compensatory damages arising from the sale of Trust No. 2's Qualcomm stock in May 1992; (3) the disgorgement of $224,533 in profits arising from Kadisha's purchase of Trust No. 2's interest in Carson '93; (4) $5,792,000 in compensatory damages arising from Kadisha's failure to protect the value of Trust No. 1's investment in Qualcomm stock in and after January 2000; (5) $543,055 in compensatory damages arising from Kadisha's use of trust funds to pay his legal expenses; (6) prejudgment interest on all of these amounts from September 19, 2000; and (7) $5,000,000 in punitive damages.

The statement of decision denied the Uzyels relief on their other claims, including claims for disgorgement of some of the profits earned by Kadisha from his purchase of Qualcomm stock in August 1988 and from his exercise of the warrants for the purchase of 43,750 shares of Qualcomm stock in September 1989; damages for the misappropriation of trust funds; lost profits resulting from the sale of Trust No. 2's Qualcomm stock in April 1999; and other claims. The statement of decision also stated that the Uzyels were entitled to recover their attorney fees pursuant to section 17211, subdivision (b).

The court filed an order on November 6, 2006, modifying the statement of decision by increasing the amount awarded for Kadisha's failure to protect the value of Trust No. 1's investment in Qualcomm stock in and after January 2000, from $5,792,000 to $6,930,400, plus prejudgment interest on that amount from September 19, 2000.

### 13. *Judgment and Amended Judgment*

The court filed a judgment on November 13, 2006, awarding the Uzyels $94,926,053 in compensatory damages and disgorgement of profits, including prejudgment interest; $5 million in punitive damages; and attorney fees in an amount to be determined. The court vacated the judgment sua sponte on November 15, 2006, stating that it had mistakenly entered judgment before the expiration of the time for Kadisha to file objections to the proposed judgment. The court stated that this was a clerical error.[10]

The court filed a new judgment on December 8, 2006, awarding the Uzyels $95,386,511 in compensatory damages and disgorgement of profits, including prejudgment interest; $5 million in punitive damages; and attorney fees in an amount to be determined. The Uzyels served a notice of entry of judgment on that same date. Kadisha filed a notice of appeal from the new judgment on December 26, 2006 (No. B196045).

### 14. *New Trial Motions and Amended Judgment*

Kadisha filed a notice of intention to move for a new trial on December 26, 2006, on several grounds, including excessive damages. The Uzyels moved for a new trial on the grounds of inadequate damages and error in law. The court denied both motions in an order filed on February 5, 2007. In denying the motions, the court (1) reduced the award on the Farahnik stock purchase claim, and (2) denied prejudgment interest on the damages arising from the sale of Trust No. 2's Qualcomm stock in May 1992 and on the damages arising from Kadisha's failure to protect the value of Trust No. 1's investment in Qualcomm stock in and after January 2000. The court invited the parties to file proposed amendments to the statement of decision in accordance with its order.

After considering the proposed amendments to the statement of decision, the trial court filed a minute order on March 2, 2007, stating that it had "reconsidered its prior ruling of February 5, 2007," and was separately filing a signed order modifying its ruling on the new trial motions. The signed order filed on March 2, 2007, modified the order of February 5, 2007, by striking the reduction in the award on the Farahnik stock purchase claim, correcting a misstated date, and adding language explaining its decision. The order of March 2 explained that the court had denied prejudgment interest in its order

---

[10] We need not decide whether the trial court properly vacated the judgment and entered a new judgment. The new judgment was identical to the original judgment for purposes of the issues raised in this appeal, except for the amount of prejudgment interest (due to the passage of time), and the new trial motions and notices of appeal were timely regardless of which judgment was effective.

of February 5 on the amounts awarded on two claims on equitable grounds so as to avoid "an undue penalty." The court filed another order on March 7, 2007, modifying its order denying the new trial motions and its order of March 2, 2007, by denying prejudgment interest on the Farahnik stock purchase claim as well.

The court entered an amended judgment on March 12, 2007, reflecting these rulings. The amended judgment awards the Uzyels $59,060,048 in compensatory damages and disgorgement of profits, including prejudgment interest on only the award for the disgorgement of profits arising from Kadisha's purchase of Trust No. 2's interest in Carson '93 and the award of damages arising from his use of trust funds to pay his legal expenses; $5 million in punitive damages; and attorney fees in an amount to be determined. Kadisha timely filed a notice of appeal from the amended judgment (No. B198007). The Uzyels also appealed the amended judgment.[11]

15. *Attorney Fees and Costs Awards*

The Uzyels moved for an award of $21 million in attorney fees under section 17211, subdivision (b). The trial court found that Kadisha had no reasonable cause to oppose the Uzyels' contest of his accounting, that he had opposed the contest in bad faith, and that the Uzyels therefore were entitled to recover attorney fees under the statute. The court concluded that the Uzyels had reasonably incurred more than $7 million in attorney fees, applied a multiplier of two, and awarded them $15,054,436 in fees, in an order filed on June 7, 2007. Kadisha moved for a new trial with respect to the fee award. The court reduced the award to $13,364,530 and denied the new trial motion. Kadisha timely appealed the order awarding fees (No. B201425).

The trial court awarded the Uzyels $334,832.84 in costs in an order filed on October 23, 2007. Kadisha filed a notice of appeal from the order on November 6, 2007 (No. B203804). The Uzyels also appealed the order. The trial court corrected and reduced the award to $250,850.64 in an order filed on November 28, 2007.

We have consolidated the five appeals.

## CONTENTIONS

Kadisha contends in his appeal that (1) the award of the disgorgement of profits arising from Kadisha's stock purchase from Farahnik in May 1991

---

[11] The Uzyels' appeal in No. B198007 was involuntarily dismissed and was subsequently reinstated. During the interim, the Uzyels filed another notice of appeal from the amended judgment (No. B199850).

was error; (2) the award of damages arising from the sale of Trust No. 2's Qualcomm stock in May 1992 was error; (3) the award of damages arising from his failure to protect the value of Trust No. 1's investment in Qualcomm stock in and after January 2000 was error; (4) the award of damages arising from his use of trust funds to pay for his legal defense included excessive prejudgment interest; (5) the punitive damages were constitutionally excessive; and (6) the award of attorney fees under section 17211, subdivision (b) was unauthorized and excessive.[12]

The Uzyels contend in their appeal that (1) they are entitled to the disgorgement of some of the profits earned by Kadisha on the Qualcomm stock that he purchased in August 1988 and September 1989; (2) they are entitled to recover lost profits arising from the sale of Trust No. 2's Qualcomm stock in April 1999; (3) they are entitled to prejudgment interest on all of the amounts awarded; (4) the punitive damages are inadequate; and (5) they are entitled to recover all of their reasonable litigation expenses as costs under section 17211, subdivision (b), notwithstanding any limitations on recoverable costs under Code of Civil Procedure section 1033.5.

## *DISCUSSION*

### 1. *Governing Law*

The Probate Code sets forth the duties of a trustee administering a trust and the measure of liability for breach of those duties. Those duties include, among others, a duty of loyalty, requiring the trustee to administer the trust solely in the interest of the beneficiaries (§ 16002, subd. (a)); a duty not to use trust property for the trustee's own profit or for any other purpose unconnected with the trust (§ 16004, subd. (a)); and a duty to exercise reasonable care, skill, and prudence in administering the trust (§§ 16040, subd. (a), 16047), including a duty to diversify investments unless it is prudent not to do so (§ 16048).[13] A trustee also has a fiduciary duty to act in good faith in the exercise of any discretionary powers conferred on the trustee by the trust instrument. (§ 16081, subd. (a).) A trustee's violation of any duty owed to the beneficiaries is a breach of trust. (§ 16400.)

---

[12] Although Kadisha appealed the order awarding costs, he does not challenge that award in his appellate briefs and therefore abandons his appeal from that order. We therefore will dismiss his appeal from that order (No. B203804). (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1131 [105 Cal.Rptr.3d 485].)

[13] The former Probate Code was repealed in 1990, effective as of July 1, 1991. (Stats. 1990, ch. 79, § 13, p. 463.) The current Probate Code became effective on that date. The Uniform Prudent Investor Act was adopted in 1995, adding sections 16045 to 16054 to the Probate Code. (Stats. 1995, ch. 63, § 6, p. 170.) Many of the provisions of the current Probate Code are identical to those of the former Probate Code. We will cite the former Probate Code only if the current provision differs from the former provision and the difference is material to the issues on appeal.

Section 16440 sets forth the measure of a trustee's liability for a breach of trust:

"(a) If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances:

"(1) Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest.

"(2) Any profit made by the trustee through the breach of trust, with interest.

"(3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust.

"(b) If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

Section 16440 does not preclude any other remedy for breach of trust that is available under statutory or common law. (§ 16442.)

2. *The Uzyels Are Not Entitled to the Disgorgement of Profits Made on Qualcomm Stock Purchased by Kadisha in August 1988 and September 1989*

a. *Trial Court Decision*

The Uzyels sought the disgorgement of some of the profits earned by Kadisha on 662,000 shares of Qualcomm stock that he purchased in August 1988 and on 43,750 shares that he purchased in September 1989 by exercising warrants, or a constructive trust over some of those shares. They argued that they were entitled to those remedies because Kadisha's misappropriation of trust funds enabled those purchases, even if the misappropriated funds could not be traced to the purchases. Specifically, they argued that although Kadisha spent the misappropriated Namco loan proceeds for other purposes, his failure to repay Trust No. 2 for those misappropriated funds made it possible for him to contribute $136,000 of his own money toward the $750,000 loan to Qualcomm in August 1988.[14] They argued alternatively that

---

[14] The Uzyels argued that as of August 1988, Kadisha had repaid only $72,000 of the $500,000 in misappropriated Namco loan proceeds.

the misappropriated Namco loan proceeds were commingled with other funds that were used to purchase the Qualcomm stock and could be traced to the purchases.

The trial court stated that in August 1988, Kadisha still owed Trust No. 2 $428,000 for the misappropriated Namco loan proceeds and that he could not have both repaid that amount and contributed $136,000 toward the loan to Qualcomm.[15] The court rejected Kadisha's argument that misappropriated trust funds must be traced to the stock purchases in order to support an award of disgorgement of profits under section 16440, subdivision (a)(2). The statement of decision stated, in a part discussing the governing law: "Kadisha incorrectly and throughout the trial steadfastly maintains that directly tracing the trustee's personal profit to actual trust dollars is necessary to establish that the trustee profited from trust assets. This is tantamount to saying: (1) that causation requires tracing; and (2) that the only possible way a trustee can benefit from the trust assets or his position as trustee is where he uses actual trust dollars for a personal investment. Kadisha has not, however, offered a single authority that supports his position—*nor are there any*. In fact, the only decision that directly discusses this point—*Nickel v. Bank of America* ([9th Cir.] 2002) 290 F.3d 1134, 1138—says precisely the *opposite*, that under California law, '[t]raceability and causation are *not* the same.' Emphasis added."

The statement of decision stated later, in a part discussing this particular claim:

"[The Uzyels] make two contentions as foundational to claiming a portion of the Qualcomm stock belongs to the beneficiaries[,] neither of which the court adopts. The first contention is that Kadisha could not have both repaid the Namco Loan, as his fiduciary duties required him to do, and paid this $136,000. The second contention is that because Kadisha used the Namco Loan proceeds for his expenses he freed up $136,000 of his own funds for the Qualcomm stock deal—thus giving him the same benefit he would have had if he had applied the Namco Loan proceeds directly to the Qualcomm stock purchase.

"The court does not find, as [the Uzyels] allege, that Kadisha benefited from the use of trust funds in acquiring his Qualcomm stock on August 8, 1988.

---

[15] To the extent that the trial court contradicted this statement by stating later in the statement of decision that it rejected the Uzyels' contention "that Kadisha could not have both repaid the Namco Loan, as his fiduciary duties required him to do, and paid this $136,000," we must resolve any ambiguity in favor of Kadisha as the prevailing party on this issue because the Uzyels failed to bring the ambiguity to the trial court's attention, as discussed *post*.

"The court finds [the Uzyels] have produced insufficient evidence (more likely to be not true) to trace Qualcomm stock (under Probate Code Section 16420(a)(9)) because Kadisha commingled his funds in a common fund and purchased the Qualcomm stock from the commingled fund. The common fund claim is not uninteresting but is as leaky as the New Orleans levee when hit by Katrina.

"[The Uzyels] contend that Kadisha's bank accounts in Union Bank and Wells Fargo Bank should be considered as one fund, like having cash in your right pocket and also your left pocket. But Kadisha's purchase money came from the $3.5 million deposited in the Sanwa Bank, the source of which did not include any Trust 2 money.

"The [Uzyels'] position is that because Kadisha had two different bank accounts, one with Wells Fargo and the other with the Union Bank, this created a single fund, and, as such was the source of acquisition by Kadisha of his Qualcomm stock from Qualcomm is denied.

"Unfortunately, for [the Uzyels], Kadisha dodges equity by showing exactly where the Namco proceeds went. [The Uzyels] claim this to be false insulation from the law which declares a trustee cannot use trust assets for his own benefit whether direct or indirect. But the claimed nexus of direct or indirect benefit to Kadisha is missing. Hence, [the Uzyels'] claim that a constructive trust (or damages) be imposed upon Kadisha's acquisition of Qualcomm stock based on the Namco loan proceeds is denied."

b. *The Uzyels Have Shown No Legal Error with Respect to Tracing*

The Uzyels contend the trial court erroneously required tracing in order to support an award of the disgorgement of profits made by Kadisha through his breach of trust under section 16440, subdivision (a)(2). The Uzyels contend this was legal error. We conclude that tracing is not required to support an award of the disgorgement of profits under the statute and that the trial court did not conclude to the contrary, so the Uyzels have shown no legal error.

We agree with the Uzyels that an award under section 16440, subdivision (a)(2) in these circumstances would not necessarily require the tracing of misappropriated funds to Kadisha's stock purchases. Subdivision (a)(2) states that a trustee who commits a breach of trust is liable in the amount of "[a]ny profit made by the trustee through the breach of trust, with interest." In our view, profits made "through" the misappropriation of trust funds are not limited to profits made by investing those particular funds or their proceeds, such as could be identified through tracing. The statutory language does not expressly impose a tracing requirement.

■ A plaintiff seeking a money judgment in personam, as distinguished from an equitable interest in a particular asset, as a remedy for unjust enrichment need only establish a causal connection between the wrongful conduct and the profits to be disgorged. The plaintiff need not trace the misappropriated funds to a particular asset as long as the plaintiff can establish a sufficient causal relationship between the wrongful conduct and the defendant's profits. (See *SEC v. Banner Fund Internat.* (D.C. Cir. 2000) 211 F.3d 602, 617;[16] Rest.3d Restitution and Unjust Enrichment (Tent. Draft No. 5, Mar. 12, 2007) § 51, coms. b & e, pp. 164, 170–175.[17]) As in cases of securities fraud (*SEC v. Banner Fund Internat., supra*, 211 F.3d at p. 617), the tracing of assets is not required for the disgorgement of profits earned by a trustee through a breach of trust. (See *Nickel v. Bank of America, supra*, 290 F.3d at pp. 1138–1139 [applying § 16440, subd. (a)(2)].)

We reject Kadisha's argument that section 16420, subdivision (a)(9) imposes a tracing requirement with respect to an award of the disgorgement of profits under section 16440, subdivision (a)(2). Section 16420, subdivision (a) describes "in general terms" the basic remedies for a breach of trust. (Cal. Law Revision Com. com., reprinted at 54A West's Ann. Prob. Code, *supra*, foll. § 16420, pp. 154–155; see also Recommendation Proposing the Trust Law (Dec. 1985) 18 Cal. Law Revision Com. Rep. (1986) p. 550 ["The proposed law seeks only to provide a brief description of the basic remedies for breach of trust as a guide to parties, without altering the basic principles of existing law."].) Section 16420 does not limit the availability of any

---

[16] "[T]he requirement of a causal relationship between a wrongful act and the property to be disgorged does not imply that a court may order a malefactor to disgorge only the actual property obtained by means of his wrongful act. Rather, the causal connection required is between the amount by which the defendant was unjustly enriched and the amount he can be required to disgorge. To hold, as Blackwell [the defendant] maintains, that a court may order a defendant to disgorge only the actual assets unjustly received would lead to absurd results. Under Blackwell's approach, for example, a defendant who was careful to spend all the proceeds of his fraudulent scheme, while husbanding his other assets, would be immune from an order of disgorgement. Blackwell's would be a monstrous doctrine for it would perpetuate rather than correct an inequity." (*SEC v. Banner Fund Internat., supra*, 211 F.3d at p. 617.)

[17] "The claimant who seeks disgorgement of profits must establish a chain of causation between the wrong complained of and the profits sought to be recovered. Depending on the nature of the transactions involved, the logic of causation can closely resemble the logic of 'tracing,' and there are many cases in which the necessary showing of causation would suffice for tracing purposes as well. . . . It is a source of regrettable confusion, however, to use the word 'tracing' (or expressions such as 'fairly traceable') to refer merely to the causal relationship between the underlying wrong to the claimant and the profit subject to disgorgement. The necessary causal relationship is what is here called the problem of *attribution*: whether the profits sought are properly 'attributable to the underlying wrong.' By contrast, the word 'tracing' is used exclusively in this Restatement to refer to the necessary relationship between one asset and another that permits a restitution claimant to assert a property interest in assets to which the defendant holds legal title." (Rest.3d Restitution and Unjust Enrichment (Tent. Draft No. 5, *supra*) § 51, reporter's notes, pp. 191–192.)

particular remedy or explain its application in particular circumstances. The availability of a particular remedy and its application in particular circumstances are governed by the common law. (Cal. Law Revision Com. com., reprinted at 54A West's Ann. Prob. Code, *supra*, foll. § 16420, pp. 154–155.) The basic remedies include monetary relief (§ 16420, subd. (a)(3)), an equitable lien or constructive trust (§ 16420, subd. (a)(8)), and recovery of a specific asset through tracing (§ 16420, subd. (a)(9)), among other remedies. A petitioner can seek the disgorgement of the trustee's profits (§ 16440, subd. (a)(2)) through a money judgment against the trustee (§ 16420, subd. (a)(3)) or seek to establish an equitable interest in specific assets through a judgment in rem (§ 16420, subd. (a)(8), (9)).[18] These are separate remedies; one remedy does not limit the other.

The Uzyels have shown no legal error, however, because they have not shown that the trial court required tracing. They argued both that they were entitled to recover a portion of the profits from Kadisha's stock purchases because Kadisha benefited from the use of misappropriated funds even if the funds could not be traced to the purchases, and that the misappropriated funds could be traced to the purchases through a commingled fund. The statement of decision expressly stated that the Uzyels need not trace trust funds to Kadisha's personal investments to show that he benefited from the use of those funds. In discussing this particular claim, the statement of decision first stated that Kadisha did not benefit from the use of trust funds in acquiring the stock in August 1988. It then stated that the Uzyels had failed to trace the funds to the stock purchases. We construe these as two separate findings. Contrary to the Uzyels' argument, the court's finding that Kadisha did not benefit from the use of trust funds was not based solely on its finding that the Uzyels had failed to establish tracing.

c. *The Uzyels Have Shown No Error in the Finding That
Kadisha's Profits Are Not Attributable to Trust Funds*

The Uzyels contend Kadisha's use of misappropriated funds to pay his personal expenses and obligations enabled him to purchase Qualcomm stock using other money. They argue that he therefore earned profits on those purchases "through the breach of trust" (§ 16440, subd. (a)(2)) within the meaning of the statute. Alternatively, they contend the misappropriated funds can be traced to the August 1988 stock purchase. The trial court found that Kadisha did not benefit from the use of trust funds in purchasing the stock and that the misappropriated funds could not be traced to the purchases, as we have stated.

---

[18] Other remedies may be available. (§ 16420, subds. (a) & (b).)

■ The disgorgement of profits is a remedy to prevent unjust enrichment. (1 Dobbs, Law of Remedies (2d ed. 1993) § 4.5(1), pp. 628–629.) The determination of the amount of a defendant's profits attributable to wrongful conduct can be a difficult task. The Restatement Third of Restitution and Unjust Enrichment (Tent. Draft No. 5, *supra*) describes this as the problem of attribution. (*Id.*, § 51, com. e, p. 171.) It involves questions of causation and remoteness, that is, how far to follow a chain of causation before deciding that the causal connection is too attenuated to justify a recovery.[19] The presence or absence of but-for causation is not necessarily determinative of unjust enrichment. Moreover, in deciding whether the defendant's profits are properly attributable to misconduct, the court should consider not only justice between the parties but also the incentives to be created for others. (Rest.3d Restitution and Unjust Enrichment (Tent. Draft No. 5, *supra*) § 51, com. e, pp. 172–175.)

The general rule stated in the tentative draft of the Restatement, which we deem applicable under California law to a trustee who has committed a breach of trust, is that profits subject to disgorgement include any form of consequential gains or other secondary enrichment "that is identifiable and measurable on the facts of the case and not unduly remote." (Rest.3d Restitution and Unjust Enrichment (Tent. Draft No. 5, *supra*) § 51, subd. (4)(a).) The party seeking disgorgement "has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain. Residual risk of uncertainty in calculating net profit is assigned to the wrongdoer." (*Id.*, § 51, subd. (4)(d).)

■ We believe that, in light of the balancing of equities involved, abuse of discretion is the appropriate standard of review of the decision whether particular profits are fairly attributable to the trustee's misconduct or, on the other hand, too remote to justify disgorgement. (*City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1256 [99 Cal.Rptr.2d 294, 5 P.3d 853] [stating that the trial court's exercise of its equitable powers in awarding a remedy is properly reviewed for abuse of discretion]; *Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 771 [110 Cal.Rptr.2d 861] [same].) An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice. (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479 [243 Cal.Rptr. 902, 749 P.2d 339]; *New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1422 [86 Cal.Rptr.3d 457].)

---

[19] The problem of attribution also may involve questions regarding the allocation of profits and the allowance of deductions and credits for the defendant's contributions to the profits. (Rest.3d Restitution and Unjust Enrichment (Tent. Draft No. 5, *supra*) § 51, com. e, p. 172.)

In our view, Kadisha's misappropriation of $500,000 of the Namco loan proceeds in May 1988 and his failure to repay $428,000 of that amount as of August 1988 were not so closely connected with his payment of $136,000 toward the loan to Qualcomm in August 1988 as to compel the conclusion that Kadisha benefited from the use of trust funds in that transaction. The immediate source of the $136,000 was Kadisha's personal Wells Fargo account into which he had deposited the $390,000 paid to him by his family and friends in return for his purchase of Qualcomm stock for them using the Sanwa loan funds.[20] Thus, the ultimate source of the $136,000 was the Sanwa loan funds. The misappropriated trust funds neither directly nor indirectly facilitated the $136,000 payment. Despite Kadisha's prior misappropriation and outstanding debt to the trust, we believe that the trial court's conclusion that any connection between the $136,000 payment and his prior misappropriation and continuing debt to the trust was too attenuated to justify the disgorgement of profits was sound. We conclude that the Uzyels have shown no abuse of discretion.

### d. *The Uzyels Have Shown No Error in the Finding That Trust Funds Cannot Be Traced to the Stock Purchase*

The Uzyels' contention that the misappropriated funds can be traced to the August 1988 stock purchase is based on their argument that the $390,000 paid to Kadisha by his family and friends in August 1988 and deposited in his Wells Fargo Bank account was not reimbursement for Sanwa loan funds that Kadisha had used to purchase stock for his family and friends, but instead was a loan to Kadisha from his family and friends. The Uzyels argue that Kadisha repaid the loan one year later using $390,000 taken from Trust No. 2. The $390,000 deposited in Kadisha's Wells Fargo Bank account in August 1988 was the immediate source of his $136,000 contribution to the $750,000 loan to Qualcomm, as we have stated. The Uzyels argue that because trust money repaid the purported loan from Kadisha's family and friends that funded the $136,000 payment, trust money ultimately funded the $136,000 payment and tracing was established.

The statement of decision expressly stated that Kadisha's friends and family paid him $390,000 in August 1988 in reimbursement for the money that he had advanced them from the Sanwa loan funds to purchase their own Qualcomm stock. Other language in the statement of decision, however, seems to suggest that the trial court disbelieved this explanation and that the $390,000 payment to Kadisha actually was a loan from his family and

---

[20] To the extent that the Uzyels argue that the $390,000 payment to Kadisha was a loan from his family and friends whom he later repaid using trust money, we conclude that the trial court found to the contrary, as explained *post*.

friends. Contrary to the Uzyels' argument that the trial court so found, we must resolve any ambiguity in this regard in favor of the judgment.

■ A statement of decision explains the factual and legal bases for the trial court's decision in a nonjury trial. (Code Civ. Proc., § 632.) If the statement of decision fails to decide a controverted issue or is ambiguous, any party may bring the omission or ambiguity to the trial court's attention either before the entry of judgment or in conjunction with a new trial motion or a motion to vacate the judgment under Code of Civil Procedure section 663. (*Id.*, § 634.)[21] If an omission or ambiguity is brought to the trial court's attention, the reviewing court will not infer findings or resolve an ambiguity in favor of the prevailing party on that issue. (§ 634.) If an omission is not brought to the trial court's attention as provided under the statute, however, the reviewing court will resolve the omission by inferring findings in favor of the prevailing party on that issue. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133–1134 [275 Cal.Rptr. 797, 800 P.2d 1227]; *Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 59–60 [58 Cal.Rptr.3d 225].) If an ambiguity is not brought to the trial court's attention as provided under the statute, the reviewing court will resolve the ambiguity by inferring that the trial court decided in favor of the prevailing party on that issue. (Code Civ. Proc., § 634.) To bring an omission or ambiguity to the trial court's attention for purposes of Code of Civil Procedure section 634, a party must identify the defect with sufficient particularity to allow the court to correct the defect. (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 498 [61 Cal.Rptr.3d 754].)

The Uzyels did not assert either before the entry of judgment or in conjunction with a new trial motion or a motion to vacate the judgment that the statement of decision failed to decide whether the $390,000 payment to Kadisha in August 1988 was a reimbursement or a loan or that the statement of decision was ambiguous in this regard. The Uzyels argued in their new trial motion that Kadisha's $136,000 payment toward the $750,000 loan to Qualcomm could be traced to the trusts through commingled funds, but did not argue that the statement of decision failed to decide the nature of the $390,000 payment to Kadisha or was ambiguous on this issue. We conclude that any ambiguity was not brought to the attention of the trial court either before the entry of judgment or in conjunction with a new trial motion or a motion to vacate the judgment, and that we therefore must resolve the

---

[21] "When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court either prior to entry of judgment or in conjunction with a motion under Section 657 or 663, it shall not be inferred on appeal or upon a motion under Section 657 or 663 that the trial court decided in favor of the prevailing party as to those facts or on that issue." (Code Civ. Proc., § 634.)

ambiguity in favor of the judgment by inferring that the court decided that the $390,000 payment to Kadisha was a reimbursement rather than a loan.[22]

The predicate for the Uzyels' tracing argument having failed, it follows that they have shown no error in the trial court's finding that trust funds could not be traced to the stock purchase. We express no opinion as to whether the facts as argued by them could establish tracing.

3. *The Award of the Disgorgement of Profits Arising from Kadisha's Stock Purchase from Farahnik in May 1991 Was Proper, but the Vacation of the Modification of the Award Is Void*

a. *Trial Court Decision*

The Uzyels sought to recover the profits earned by Kadisha on 30,000 shares of Qualcomm stock that he purchased from Farahnik in May 1991 or, alternatively, to establish a constructive trust over those shares. They argued that they were entitled to those remedies because misappropriated trust funds had paid for Kadisha's loans to Farahnik. According to the Uzyels, Kadisha drew on his Union Bank line of credit to lend a total of $221,000 to Farahnik, used $240,000 of the Namco loan proceeds belonging to Trust No. 2 to repay the line of credit, and then paid for the 30,000 shares by canceling $210,000 of Farahnik's $221,000 debt to Kadisha. The Uzyels argued that Kadisha had gained an advantage from his use of the trust funds and should be required to disgorge the profits earned through his use of the trust funds pursuant to section 16440, subdivision (a)(2). They argued alternatively that 960,000 shares of Qualcomm stock acquired as a direct result of the purchase through subsequent stock splits should be subject to a constructive trust.

The trial court found that Kadisha's misappropriation of trust funds had enabled his acquisition of stock from Farahnik, but found that Kadisha did not use actual trust money in making the loans and did not "ha[ve] his eye on Trust 2's probable assets at the time" that he made the loans to Farahnik. The statement of decision stated: "Because Kadisha used a portion of the Namco Loan proceeds (the property of Trust 2) to wipe out his obligation to Union Bank, there was clearly substitute funding of $112,302 of the Farahnik loans by the use of Trust 2's money. Kadisha, by his actions and conduct, had to know that what he was doing with Trust 2's money was wrongful. He abstained from making any note to [T]rust 2 concurrent with his taking of the Namco Loan proceeds. He never had a note signed by Farahnik to Trust 2 concurrent with Kadisha paying off Union Bank with Trust 2's money. He

---

[22] The Uzyels do not challenge the sufficiency of the evidence to support this finding, so we need not address that question.

gave six different, incorrect explanations for what he did with the Namco Loan proceeds prior to trial to prevent [the Uzyels] from discovering that he had used a portion of the proceeds to pay off his Union Bank line of credit for funds he had borrowed to loan to Farahnik. [¶] . . . Kadisha must . . . disgorge any profit, benefit or advantage he acquired through his dealings with trust assets."

The trial court found that Kadisha's Union Bank line of credit was the source of $151,000 of the $221,000 lent to Farahnik, The court also found that Kadisha had contributed $38,698 of his own money, reduced $151,000 by that amount ($151,000 – $38,698 = $112,302), and determined that $112,302 was 53.48 percent of the $210,000 purchase price for the 30,000 shares of Qualcomm stock purchased from Farahnik in May 1991. The court found that the 30,000 shares held by Kadisha had grown to 480,000 shares by September 2000 due to stock splits, and concluded that the Uzyels were entitled to recover the value of 256,704 shares (53.48 percent of 480,000) upon the trusts' termination. The court determined the value of those shares based on their lowest market price between September 14 and September 18, 2000 ($61.62 per share), and awarded the Uzyels a total of $15,818,000 on this claim.

Kadisha argued in his new trial motion that there was no causal connection between the misappropriation of trust funds and his purchase of Qualcomm stock from Farahnik. He also argued that the damages awarded on this claim were excessive and that any damages should be limited to a proportionate share of Kadisha's profits earned until the time that he purportedly fully repaid Trust No. 2 for all misappropriated funds, with interest, on November 22, 1996. In an order filed on February 5, 2007, the trial court denied Kadisha's new trial motion, but reduced the amount awarded on this claim from $15,818,000 to an amount to be determined based on the value of the shares as of November 22, 1996.

The order of February 5, 2007, stated: "The measure of damages and the amount thereof shall be modified to award damages based on the value of the number of Farahnik shares referred to in the Statement of Decision as of the date the period of [Kadisha's] misappropriation ended, i.e. November 22, 199 [sic], less [Kadisha's] acquisition cost." It stated further, "Anything at variance herein with the filed Statement of Decision, shall be deemed incorporated in the said Statement of Decision." A minute order filed on February 6, 2007, directed the Uzyels to submit a proposed amended judgment in accordance with the ruling on the new trial motion.

The Uzyels filed a response to the court's order regarding amendments to the statement of decision on February 16, 2007, objecting to the reduction of

the award. The trial court, in an order filed on February 17, 2007, requested further briefing on the issue. Kadisha argued that the Uzyels' objections were improper and that the amount of damages based on the closing price of $40.83 on November 22, 1996, minus the cost of acquiring the shares, was $1,197,845. The trial court, in an order filed on March 2, 2007, stated that upon further consideration, its order of February 5, 2007, was modified to delete the reduction of the award.[23] The court explained that the misappropriated trust funds enabled Kadisha to acquire a portion of the 30,000 shares of Qualcomm stock from Farahnik and that the Uzyels were entitled to the disgorgement of profits earned until the trusts' termination.

### b. *The Order Vacating the Modification of the Award Is Void*

Kadisha contends the trial court had no jurisdiction to restore the $15,818,000 award after ruling on the new trial motion and modifying the judgment. We agree.

A trial court ruling on a new trial motion must do so within 60 days after the earlier of the date of mailing by the court clerk or service by a party of a notice of entry of judgment or the date of filing of a notice of intention to move for a new trial. (Code Civ. Proc., § 660, 3d par.) If the court fails to rule on the motion within that time period, the motion is denied by operation of law. (*Ibid.*) An order ruling on a new trial motion after the 60-day period is beyond the court's jurisdiction and is void. (*Siegal v. Superior Court* (1968) 68 Cal.2d 97, 101 [65 Cal.Rptr. 311, 436 P.2d 311].) .

Code of Civil Procedure section 662 authorizes a trial court in ruling on a new trial motion after a nonjury trial to modify or vacate the statement of decision or the judgment, in whole or in part, in lieu of granting a new trial.[24] (*Spier v. Lang* (1935) 4 Cal.2d 711, 714 [53 P.2d 138].) It also authorizes the court to "reopen the case for further proceedings and the introduction of additional evidence with the same effect as if the case had been reopened after the submission thereof and before a decision had been

---

[23] The order of March 2, 2007, stated in part, "The Court herewith deletes any modification of its determination of damages re the Farahnik Claim as set forth in the Court's Statement of Decision . . . . "

[24] Code of Civil Procedure section 662 states: "In ruling on such motion, in a cause tried without a jury, the court may, on such terms as may be just, change or add to the statement of decision, modify the judgment, in whole or in part, vacate the judgment, in whole or in part, and grant a new trial on all or part of the issues, or, in lieu of granting a new trial, may vacate and set aside the statement of decision and judgment and reopen the case for further proceedings and the introduction of additional evidence with the same effect as if the case had been reopened after the submission thereof and before a decision had been filed or judgment rendered. Any judgment thereafter entered shall be subject to the provisions of sections 657 and 659."

filed or judgment rendered."[25] (Code Civ. Proc., § 662.) The effect of granting relief pursuant to Code of Civil Procedure section 662 is to deny the new trial motion. (*Concerned Citizens Coalition of Stockton v. City of Stockton* (2005) 128 Cal.App.4th 70, 77–78 [26 Cal.Rptr.3d 735]; *Avery v. Associated Seed Growers, Inc.* (1963) 211 Cal.App.2d 613, 621 [27 Cal.Rptr. 625] (*Avery*).) Thus, an order granting relief pursuant to Code of Civil Procedure section 662 is a "ruling on the motion" for a new trial within the meaning of Code of Civil Procedure section 660. (*Taormino v. Denny, supra*, 1 Cal.3d 679, 683.)

■ A trial court has no authority to rule on a new trial motion by granting relief pursuant to Code of Civil Procedure section 662 after the expiration of the 60-day period to rule on a new trial motion. (*Tuck v. Tuck* (1966) 245 Cal.App.2d 260, 263 [53 Cal.Rptr. 872]; *Avery, supra*, 211 Cal.App.2d at p. 629.) A court that timely rules on a new trial motion by vacating the statement of decision or the judgment, however, may file a new statement of decision or judgment after the expiration of the 60-day period. (*Taormino v. Denny, supra*, 1 Cal.3d 679, 683; *Avery, supra*, 211 Cal.App.2d at p. 628.) This is because an order vacating the statement of decision or the judgment necessarily contemplates further rulings by the court in the form of a new statement of decision or judgment, and Code of Civil Procedure section 662 imposes no limitation on the time to file a new statement of decision or judgment after the statement of decision or the judgment is timely vacated. (*Avery, supra*, 211 Cal.App.2d at p. 628.)

■ An order modifying the statement of decision or the judgment without vacating either differs from an order vacating the statement of decision or the judgment in that a modification order does not necessarily contemplate further rulings by the trial court. The question arises whether a modification of the statement of decision or the judgment must be completed within the 60-day period to rule on a new trial motion. The California Supreme Court in *Spier v. Lang, supra*, 4 Cal.2d 711, held that a minute order filed within the 60-day period to rule on a new trial motion, denying the motion and modifying the judgment, satisfied the requirements of Code of Civil Procedure section 660 and that documents filed after the 60-day period more formally amending the findings and the judgment consistent with the prior ruling were properly deemed effective as of the date of the minute order. (*Spier, supra*, at p. 715.) Similarly, *De Arman v. Connelly* (1933) 134 Cal.App. 173 [25 P.2d 24] held that, after ordering the denial of a new trial motion and modification of the judgment within the 60-day period to rule on the motion, the trial court properly filed documents formally amending the findings and the judgment

---

[25] The effect of reopening the case is to vacate the statement of decision and the judgment and return the case to its posture before the filing of the statement of decision and the entry of judgment. (*Taormino v. Denny* (1970) 1 Cal.3d 679, 684 [83 Cal.Rptr. 359, 463 P.2d 711].)

consistent with the prior ruling after the expiration of the 60-day period. (*Id.* at p. 180; see also *Medak v. Cox* (1970) 12 Cal.App.3d 70, 73–74 [90 Cal.Rptr. 452]; *Holland v. Superior Court* (1932) 121 Cal.App. 523, 532 [9 P.2d 531].)

The trial court here did not vacate the statement of decision or the judgment. Instead, the court in its order of February 5, 2007, specified particular modifications to its decision, including the reduction of the award on this claim. We construe the order as a modification of both the statement of decision and the judgment. The order was timely because it was filed within 60 days after the service on Kadisha of a notice of entry of judgment on December 8, 2006. (Code Civ. Proc., § 660.) Then, after the expiration of the 60-day period to rule on the new trial motion, the court in its order of March 2, 2007, vacated its modification of the award. The later order was not consistent with the prior order and cannot be viewed as implementing its prior modification of the award. Instead, the later order vacated the prior modification of the award and constituted a new ruling on the new trial motion. We conclude that the order of March 2 was untimely and therefore was beyond the court's jurisdiction and void because it was made after the expiration of the 60-day period to rule on the new trial motion.

Our conclusion that the trial court had no jurisdiction to vacate its prior modification of the award also is compelled by the rule that a final order granting or denying a new trial motion, regularly made, exhausts the trial court's jurisdiction and cannot be set aside or modified by the trial court except for clerical error or to grant relief under Code of Civil Procedure section 473. (*Wenzoski v. Central Banking System, Inc.* (1987) 43 Cal.3d 539, 542 [237 Cal.Rptr. 167, 736 P.2d 753] (*Wenzoski*).) This rule ordinarily is invoked where the court, having granted a new trial motion, later reconsiders its ruling and denies the motion (e.g., *Bloomquist v. Haley* (1928) 204 Cal. 258, 260 [268 P. 364]; *Drinkhouse v. Van Ness* (1927) 202 Cal. 359, 369–370 [260 P. 869]), or the court, having denied a new trial motion, later reconsiders its ruling and grants the motion (e.g., *Stevens v. Superior Court* (1936) 7 Cal.2d 110, 112–114 [59 P.2d 988]; *Hinrichs v. Maloney* (1959) 169 Cal.App.2d 544, 546 [337 P.2d 471]).[26] We believe that the same principle applies where the court, having timely modified the statement of decision or the judgment, later reconsiders its ruling and substitutes a different ruling inconsistent with the initial ruling. We hold that such a later ruling is beyond the court's jurisdiction and void.

---

[26] This is not invariably the case. The plaintiff in *Wenzoski, supra,* 43 Cal.3d 539, filed two new trial motions on the same grounds. The trial court denied the first new trial motion and, several weeks later, denied the second. *Wenzoski* stated that the trial court exhausted its jurisdiction to rule on the matter by denying the first motion. (*Id.* at p. 542.) *Wenzoski* therefore held that the order denying the second new trial motion was ineffective and that the time to appeal ran from the date of entry of the order denying the first motion. (*Ibid.*)

*Clarke v. Fiedler* (1941) 44 Cal.App.2d 838 [113 P.2d 275], cited by the Uzyels, is not on point. The trial court in that case vacated the findings and the judgment in a minute order timely ruling on a new trial motion. (*Id.* at pp. 841–842, 848.) The minute order specifically referred to particular findings, but the new findings and new judgment apparently included changes not specifically identified in the minute order. (*Id.* at p. 848.) *Clarke* stated that having vacated the findings and the judgment, the trial court was authorized to file new findings and a new judgment, "and it was not required that such new findings be limited to those expressly referred to in the valid minute order setting aside, within the statutory time, the original findings and judgment." (*Ibid.*) Here, in contrast, the trial court in its order of February 5, 2007, did not vacate the statement of decision or the judgment, but instead only modified the statement of decision and the judgment. The court had no jurisdiction to reconsider and set aside, in whole or in part, its timely ruling on the new trial motion.

We conclude that the order of March 2, 2007, restoring the award of $15,818,000 is void and that the award set forth in the order of February 5, 2007, based on the value of the shares on November 22, 1996, is effective.[27]

c. *Kadisha's Profits Are Attributable to Trust Funds*

Kadisha lent a total of $221,000 to Farahnik from February to April 1988, including $151,000 drawn on his Union Bank line of credit. He used $240,000 of the misappropriated Namco loan proceeds to repay his line of credit in May 1988, but the trial court found that Kadisha did not "ha[ve] his eye on" trust assets (i.e., intend to use trust assets for this purpose) at the time that he lent the money to Farahnik. Kadisha purchased 30,000 shares of Qualcomm stock from Farahnik in May 1991 and paid for the shares by canceling $210,000 of Farahnik's debt to Kadisha. Thus, Kadisha's Union Bank line of credit ultimately paid for the stock purchase, and the misappropriated trust funds repaid the funds drawn on the line of credit. Whether by choice, by carelessness, or by necessity, Kadisha established a close connection between the trust funds and the stock purchase by using the trust funds in this manner. In our view, despite the absence of either a prior intent to use the trust funds in this manner or but-for causation, this connection between the misappropriated trust funds and the stock purchase justifies the trial court's conclusion that the profits earned on the stock are attributable to the trust funds. We therefore conclude that the award of the disgorgement of profits was proper.

---

[27] The Uzyels do not challenge the reduction of the award in the order of February 5, 2007, and therefore abandon any claim that such reduction was error.

### 4. The Uzyels Are Entitled to an Award of Lost Profits Resulting from the Sale of Trust No. 2's Qualcomm Stock in May 1992

#### a. Trial Court Decision

The Uzyels sought to recover the profits that Trust No. 2 would have earned on 37,500 shares of Qualcomm stock if Kadisha had not sold those shares in May 1992. They argued that Kadisha sold the shares solely for his own benefit and funneled the sale proceeds to himself through the fictitious loan to "Rahban," breaching his duty of loyalty, and that the sale was imprudent. They argued that they were entitled to recover the trust's lost profits pursuant to section 16440, subdivision (a)(3).

The Uzyels argued that the lost profits should be calculated based on the value of the shares upon the termination of the trusts in September 2000. They cited by analogy cases involving a fiduciary's fraudulent inducement of the sale of an asset (*Strebel v. Brenlar Investments, Inc.* (2006) 135 Cal.App.4th 740 [37 Cal.Rptr.3d 699]; *Mitchell v. Texas Gulf Sulphur Company* (10th Cir. 1971) 446 F.2d 90) and argued that those cases supported an award of lost profits based on the appreciation of the asset as of a reasonable time after the discovery of the fraud. The Uzyels argued that the reason for such a rule was that the defrauded seller should be allowed a reasonable time after the discovery of the fraud to decide whether to reinvest the funds. They argued further that because Kadisha controlled the trust funds and failed to provide accurate accountings, their first opportunity to reinvest the funds was upon the termination of the trusts in September 2000.

The trial court found that Kadisha sold the 37,500 shares solely for his own benefit, that Rahban was a fictitious borrower, and that Kadisha used the $801,000 in sale proceeds to repay his own debt to Trust No. 2. The court therefore found that Kadisha breached his duty of loyalty by selling the shares. The court also found that Kadisha did not consult an investment adviser before selling the shares or investing the sale proceeds, that he sold the shares "without any economic justification," and that selling the shares to raise cash for his own use was not prudent investing. Thus, the court found that Kadisha breached both his duty of loyalty and his duty to invest prudently. The court also found that by selling the shares and misappropriating the proceeds, Kadisha avoided having to sell his own Qualcomm stock and thus profited from its appreciation. The court declined to excuse Kadisha from liability pursuant to section 16440, subdivision (b) because it found that "Kadisha did not act reasonably or in good faith in selling Trust 2's Qualcomm stock for his own purposes and attempting to conceal his wrongdoing in the fraudulent guise of the Rahban loan."

The trial court concluded that the Uzyels were entitled to treat the May 1992 stock sale as if it had never occurred and stated, "therefore, the Court must treat the sale as not having been made, and the stock should have been held until the termination of Trust 2 . . . ." The court found that the 37,500 shares had grown to 600,000 shares by September 2000 due to stock splits, and concluded that the Uzyels were entitled to recover the value of 600,000 shares upon the trusts' termination, minus the proceeds from the sale of the 37,500 shares in May 1992. The court determined the value of 600,000 shares based on their lowest market price between September 14 and September 18, 2000 ($61.62 per share). The court augmented the sale proceeds by 13 percent interest from May 1992 through November 1996, plus 10 percent interest from December 1996 to September 18, 2000.[28] The court calculated a total award of $35,389,242 on this claim, and also awarded prejudgment interest on that amount from September 19, 2000.

Kadisha argued in his new trial motion that the evidence did not support the finding that there was no economic justification for the sale, but he did not challenge the finding that he breached his duty of loyalty. He also argued that the damages resulting from a breach of trust depended on what would have occurred absent the breach of trust. He argued that in these circumstances, the measure of damages for selling the stock in breach of his duty to invest prudently should be based on what a prudent investment would have earned, and by that measure the damages should be zero. He also argued that even if the damages were based on the appreciation of Qualcomm stock after May 1992, the evidence indicated that it would have been prudent to sell the shares long before September 2000.

The trial court denied the new trial motion with no change in the award of damages on this claim, except that the court denied prejudgment interest on the claim.

b. *Kadisha Cannot Negate His Breach of the Duty of Loyalty*

Kadisha contends Qualcomm stock was a very risky investment in May 1992, particularly in light of the fact that Qualcomm stock constituted a high percentage of Trust No. 2's assets. Kadisha contends the stock was an inappropriate investment for the trust, so he had a duty to sell the shares and cannot be held liable for discharging that duty with an improper motive.

---

[28] The Uzyels had argued that interest should be 13 percent from May 1992 through November 1996 because Kadisha paid that rate of interest on the fictional loan to "Rahban." They had argued that interest should be 10 percent from December 1996 to September 18, 2000, "as a conservative measure, even though the Trust did not earn 10% on the sales proceeds." The trial court adopted these figures in its statement of decision.

Kadisha does not challenge the trial court's finding that he sold the shares solely to raise cash for his own use.

■■■ The duty of loyalty, requiring a trustee to administer the trust solely in the interest of the beneficiaries (§ 16002, subd. (a)), is the most fundamental duty of a trustee. (Bogert & Bogert, The Law of Trusts and Trustees (rev. 2d ed. 1993) § 543, p. 217 (Bogert); 2A Scott & Fratcher, The Law of Trusts (4th ed. 1987) § 170, p. 311.) Its purpose is to protect the best interests of the beneficiaries. The duty of loyalty requires a trustee to subordinate his or her interests to those of the beneficiaries in every regard. (Bogert, *supra*, § 543, pp. 217–219.) A trustee's motive in administering the trust is of paramount importance, and ensuring that the trustee will act in the sole interests of the beneficiaries rather than with some other motive is the principal object of the duty of loyalty. (Hallgring, *The Uniform Trustees' Powers Act and the Basic Principles of Fiduciary Responsibility* (1966) 41 Wash. L.Rev. 801, 808–811 (Hallgring).)

Trust beneficiaries are particularly vulnerable to self-dealing and other abuses by trustees. Beneficiaries typically lack the financial sophistication necessary to monitor the trustee's investment decisions and discover abuses. The confidentiality of trust management decisions and lack of public information concerning the trust's performance shield trustees from market forces and other external pressures that can curb the abuses of fiduciaries in other contexts. Moreover, the cost and difficulty of ending the trust relationship, which ordinarily requires litigation to remove a trustee for cause, distinguish trusts from other confidential relationships that can be terminated more readily. (Leslie, *In Defense of the No Further Inquiry Rule: A Response to Professor John Langbein* (2005) 47 Wm. & Mary L.Rev. 541, 558–563 (Leslie); Rest.3d Trusts, § 78, com. b, p. 96.) These circumstances explain why the law is more protective of trust beneficiaries than of participants in other fiduciary relationships, such as corporate shareholders. (Leslie, *supra*, at pp. 554–555; Sitkoff, *Trust Law, Corporate Law, and Capital Market Efficiency* (2003) 28 J. Corp. L. 565, 572–574.)

■■■ A trustee is strictly prohibited from administering the trust with the motive or purpose of serving interests other than those of the beneficiaries. (Rest.3d Trusts, § 78, subd. (1) & com. f, p. 109; see also *id.*, § 87, com. c, p. 244 ["An abuse of discretion may result from the exercise of discretionary authority in bad faith or from improper motive."].) A trustee also is strictly prohibited from engaging in transactions in which the trustee's personal interests may conflict with those of the beneficiaries without the express authorization of either the trust instrument, the court, or the beneficiaries.

(Bogert, *supra*, §§ 543, 543(U), pp. 218–219, 422–440; Rest.3d Trusts, § 78, subd. (2) & com. b, pp. 95–96.) It is no defense that the trustee acted in good faith, that the terms of the transaction were fair, or that the trust suffered no loss or the trustee received no profit. This is known as the no further inquiry rule. (Bogert, *supra*, § 543, pp. 247–248; Rest.3d Trusts, § 78, coms. b & d, pp. 95–96, 103–104.) Such a transaction is voidable at the election of the beneficiaries, and other remedies may be available, including an award of profits that the trust would have made if not for the breach of trust. (Bogert, *supra*, §§ 543, 543(V), pp. 247, 441–452; Rest.3d Trusts, Prudent Investor Rule, § 206, com. a, p. 229.) This rule is prophylactic and is justified in part by its deterrent effect. (Bogert, *supra*, § 543, pp. 246–247; Rest.3d Trusts, § 78, com. b, p. 96.) If the original purchase of an asset was a breach of the duty of prudent investing, the beneficiaries are entitled to affirm that transaction, waiving the breach, and enforce their remedies for a separate breach of the duty of loyalty in connection with the sale of the asset. (Rest.3d Trusts, Prudent Investor Rule, § 205, com. a, pp. 223–224; Rest.3d Trusts (Tent. Draft No. 5, Mar. 2, 2009) § 95, p. 24.)

 Kadisha breached his duty of loyalty by selling the shares solely for his own benefit and without regard to the interests of the beneficiaries. He breached his duty of loyalty regardless of whether a faithful trustee exercising reasonable care and acting in the best interests of the beneficiaries would have sold the shares at the same time.[29] In our view, to allow a trustee to attempt to justify a breach of the duty of loyalty by showing that the transaction was consistent with, or even compelled by, the duty to invest prudently would seriously undermine the duty of loyalty and impair its deterrent value. (Rest.3d Trusts, § 78, com. b, p. 96 [discussing the difficulty of second-guessing the trustee's exercise of discretion and the relative ease of concealing misconduct]; Hallgring, *supra*, 41 Wash. L.Rev. at pp. 810–811 [same].) A court may excuse a trustee from liability for a breach of trust if the trustee acted reasonably and in good faith under the circumstances known to the trustee. (§ 16440, subd. (b).) But we are aware of no authority to excuse from the statutory measure of liability for a breach of trust (§ 16440, subd. (a)) a trustee who acted in bad faith by serving his own interests. Accordingly, we conclude that the fact that the sale might have been in the

---

[29] Former section 16040, subdivision (b), which governed at the time of the sale in May 1992, stated: "When investing, reinvesting, purchasing, acquiring, exchanging, selling, and managing trust property, the trustee shall act with the care, skill, prudence, and diligence under the circumstances then prevailing, including but not limited to the general economic conditions and the anticipated needs of the trust and its beneficiaries, that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims to accomplish the purposes of the trust as determined from the trust instrument. In the course of administering the trust pursuant to this standard, individual investments shall be considered as part of an overall investment strategy."

best interests of the trust, or even compelled by the duty to invest prudently, if true, does not excuse Kadisha from liability for his breach of the duty of loyalty.

### c. *The Award of Appreciation Damages Was Proper*

Kadisha also challenges the calculation of damages based on the value of the shares in September 2000. He argues that any damages resulting from his breach of trust must be determined by considering what would have occurred absent the breach of trust. He argues further that any damages must be based on what a prudent investor would have done with the shares, and that the evidence compels the conclusion that a prudent investor would have sold the shares in May 1992 or earlier, so there were no damages. As in his new trial motion, Kadisha's argument on appeal ignores the trial court's finding that he breached not only his duty of prudent investing but also his duty of loyalty.

The calculation of damages based on what a prudent investor would have done would be appropriate for a breach of the duty of prudent investing. Such a calculation would reflect what would have occurred if Kadisha had complied with the duty of prudent investing (i.e., but for the breach of the duty of prudent investing) and therefore would show the amount of profits lost as "the result of the breach of trust" (§ 16440, subd. (a)(3)). The duty of loyalty, however, exists independently of the duty to invest prudently, and the damages resulting from a breach of the duty of loyalty are not necessarily the same as those resulting from a failure to invest prudently. Damages for a breach of the duty of loyalty should be based on what would have occurred if the trustee had complied with the duty of loyalty (i.e., but for the breach of the duty of loyalty). Only then would the damages reflect the amount of profits lost as a result of the breach of the duty of loyalty. Accordingly, we reject Kadisha's argument that the damages for a breach of the duty of loyalty must be based on what a prudent investor would have done with the shares.

The remedy for a breach of trust should be adapted "to fit the nature and gravity of the breach and the consequences to the beneficiaries and trustee." (Bogert, *supra*, § 543(V), p. 441.) The goals of the remedy are not only to compensate the beneficiaries for their loss, but also to deter the trustee in question and other trustees from committing similar acts. (*Ibid.*) Particularly with respect to the duty of loyalty, "the principal object of the administration of the rule is preventative, to make the disobedience of the trustee to the rule so prejudicial to him that he and all other trustees will be induced to avoid disloyal transactions in the future." (*Id.*, § 543, pp. 246–247.) Here, Kadisha breached his duty of loyalty by selling 37,500

shares of Qualcomm stock in May 1992 solely for his own benefit and without regard to the interests of the beneficiaries. The stock value later appreciated dramatically.

The term "appreciation damages" refers to the amount of an asset's appreciation from the date of sale generally to the date of trial or judgment.[30] (*Estate of Anderson* (1983) 149 Cal.App.3d 336, 354 [196 Cal.Rptr. 782]; Bogert, *supra*, § 543(V), p. 446.) Section 16440, subdivision (a)(3) states that damages for a breach of trust can include "[a]ny profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust." Such lost profits can include appreciation damages in some circumstances, particularly where the trustee breached the duty of loyalty. (See *Estate of Anderson, supra,* at p. 355 [affirmed under prior law an award of appreciation damages against an executor that had breached its duty of loyalty in the sale of real property]; *Estate of Talbot* (1956) 141 Cal.App.2d 309, 326–327 [296 P.2d 848] [held under prior law that absent a breach of the duty of loyalty or breach of a duty to retain or acquire specific assets, a trustee could not be held liable for appreciation damages]; see also *Strebel v. Brenlar Investments, Inc., supra,* 135 Cal.App.4th at pp. 753–754 [affirmed an award of appreciation damages against a real estate agent based on fraud].) Damages measured by the lost appreciation of an asset may exceed the amount of the loss as of the date of sale (i.e., the difference between the value of the asset at the time of sale and the price paid) and the trustee's profit from the sale, if any, and may provide an appropriate deterrent to disloyalty.

An award of appreciation damages based on a breach of the duty of loyalty does not imply or require a finding that the trustee had an independent duty to retain the asset. Instead, appreciation damages can be awarded as lost profits under section 16440, subdivision (a)(3) if the trustee sold the asset in breach of the duty of loyalty and the trust lost profits as a result. Accordingly, we reject Kadisha's argument that he had no duty to retain the shares and therefore cannot be liable for appreciation damages.[31]

---

[30] The trial court awarded appreciation damages based on the stock's value as of the date of the termination of the trust in September 2000, rather than the date of trial or judgment. Kadisha does not contend any appreciation damages should have been based on the stock's value as of some other date, but instead argues only that the Uzyels are not entitled to appreciation damages because he had no duty to retain the stock. Accordingly, we need not decide whether the court properly calculated the damages based on the stock's value in September 2000.

[31] Kadisha does not argue that the trial court made no factual finding that, but for his breach of the duty of loyalty, he would have retained the shares until the termination of the trust in September 2000, or that the evidence is insufficient to support such a finding. We therefore need not address those questions.

5. *The Uzyels Are Not Entitled to Lost Profits Resulting from the Sale of Trust No. 2's Qualcomm Stock in April 1999*

 a. *Trial Court Decision*

The Uzyels sought to recover the profits that Trust No. 2 would have earned on 53,348 shares of Qualcomm stock if Kadisha had not sold those shares in April 1999. They alleged in their amended and consolidated petition filed in September 2004, after the close of evidence, that Kadisha sold the shares "in bad faith and without just cause" and that the sale was "imprudent." They argued in their closing trial brief filed in December 2004 that Kadisha believed that the stock would increase in value and that he sold the shares solely to deprive Dafna Uzyel of the expected appreciation, breaching his duty of loyalty.

The statement of decision stated, "The court finds the evidence insufficient for the court to conclude that Kadisha sold the subject shares to 'hurt Dafna.'" The trial court found that Kadisha's testimony that he sold the shares pursuant to a long-term investment strategy to acquire more conservative investments, and that he believed that holding the stock of a publicly traded company was too risky for the trust, was false. The court found, to the contrary, that Kadisha was confident that the stock would appreciate and that he retained most of his own Qualcomm stock at the time. The court also found that the purported sale of 10,000 shares of Qualcomm stock by Trust No. 2 to Trust No. 1 in October 1998 was "a phony, backdated transaction," and that the sale actually occurred in April 1999.

The statement of decision stated that it was difficult to determine why Kadisha sold the 53,348 shares and that there was no evidence that he acted as a prudent investor in selling the shares. In its statement of decision, the court stated:

"It is difficult to glean just what Kadisha had in mind when he made the sale. There is no evidence he considered or complied with Probate Code section 16047(a) which provides:

" 'A trustee shall invest and manage trust assets as a prudent investor would, by considering the purposes, terms, distribution requirements and other circumstances of the Trust.'

"There is no evidence Kadisha acted as a 'prudent investor.' And he never sought professional advice about the sale. Further, the catch-all phrase 'and other circumstances of the trust' is of no help to Kadisha.

"Kadisha's unacceptable creativity as to the facts as to why he made the sale and what he did by altering the facts concerning the sale are of substantial concern to the Court, certainly revealing some sort of character defect but not of such magnitude as to alone give cause for the Court to award damages."

The statement of decision, in discussing the award of no compensatory damages on this claim, did not expressly state whether Kadisha breached his duty of loyalty by selling the shares, but in later discussing punitive damages the statement of decision twice stated that Kadisha sold the shares in April 1999 in "bad faith."

### b. *Implied Findings Support the Judgment on This Claim*

The Uzyels contend the trial court found that Kadisha breached his duty of prudent investing and his duty of loyalty in selling the 53,348 shares of Qualcomm stock in April 1999. They argue that they therefore are entitled to an award of lost profits under section 16440, subdivision (a)(3) in the amount of $15,126,335.

We construe the trial court's finding that there was no evidence that Kadisha acted as a prudent investor as a finding that he breached his duty of prudent investing. We conclude that the statement of decision cannot reasonably be construed to the contrary and that it is unambiguous in this regard.[32] The Uzyels therefore are entitled to an award of damages under section 16440, subdivision (a), unless the court either (1) found that they suffered no damages or (2) found pursuant to section 16440, subdivision (b) that Kadisha acted reasonably and in good faith under the circumstances then known to him and exercised its discretion to excuse him from liability.

The statement of decision, however, did not expressly state that the Uzyels suffered no damages as a result of the sale or state what the appropriate measure of liability would be. The question arises whether we can infer findings to support the judgment awarding no damages on this claim.

The Uzyels did not assert either before the entry of judgment or in conjunction with a new trial motion or a motion to vacate the judgment that the statement of decision failed to decide whether they suffered any damages as a result of Kadisha's breach of his duty of prudent investing or that the statement of decision was ambiguous in this regard. They argued in their new trial motion only that the failure to award damages on the claim was error;

---

[32] We need not decide whether the trial court also found that Kadisha breached his duty of loyalty, as explained *post.*

they did not argue that the statement of decision failed to decide the issue or was ambiguous or request clarification of the decision on this issue. We conclude that the statement of decision did not state why no damages were awarded for Kadisha's breach of his duty of prudent investing, that the omission was not brought to the attention of the trial court either before the entry of judgment or in conjunction with a new trial motion or a motion to vacate the judgment, and that we therefore must infer findings to support the judgment. (Code Civ. Proc., § 634; *In re Marriage of Arceneaux, supra*, 51 Cal.3d at pp. 1133–1134.)

The trial court reasonably could have found that the sale of 53,348 shares of Trust No. 2's Qualcomm stock in April 1999 resulted in no loss to the trust under section 16440, subdivision (a)(1) and that an award of the trust's lost profits under section 16440, subdivision (a)(3) was unwarranted. Kadisha, as trustee, sold the stock for Trust No. 2 for approximately $200 per share, having purchased it for the trust for $4 per share.[33] Trust No. 2 therefore realized a significant gain (more than $10 million), rather than a loss, from the sale as of the date of the sale. Accordingly, substantial evidence supports the implied finding that Trust No. 2 suffered no loss compensable under section 16440, subdivision (a)(1) as a result of the sale. Moreover, there is no indication that Kadisha personally profited from the sale so as to justify an award of the disgorgement of profits under section 16440, subdivision (a)(2).

Section 16440, subdivision (a) expressly authorizes the trial court to determine which of the three measures of liability provided under the statute "is appropriate under the circumstances." We construe this as a grant of discretion to the trial court and therefore review the trial court's selection of the appropriate measure of liability for abuse of discretion. An abuse of discretion occurs only if the reviewing court, considering the applicable law and all of the relevant circumstances, concludes that the trial court's decision exceeds the bounds of reason and results in a miscarriage of justice. (*Shamblin v. Brattain, supra*, 44 Cal.3d at pp. 478–479; *New Albertsons, Inc. v. Superior Court, supra*, 168 Cal.App.4th at p. 1422.) In our view, the trial court reasonably could have concluded that, in light of the tremendous appreciation in the value of the stock from the time of its purchase in January 1994 until its sale in April 1999, an award of damages under section 16440, subdivision (a)(3) based on the appreciation of the stock after April 1999 was unwarranted. We presume that the trial court so concluded and find no error in this finding.

These same implied findings would support the judgment on this claim whether Kadisha breached only his duty of prudent investing or also breached

---

[33] This figure represents the purchase price of $8 per share adjusted for the two-for-one stock split that occurred before the sale.

his duty of loyalty, so we need not decide whether the trial court found that Kadisha breached his duty of loyalty as well. In light of our conclusion, we need not address Kadisha's other arguments in support of the judgment on this claim.

### 6. The Uzyels Are Entitled to an Award of Damages Resulting from the Failure to Protect the Value of Trust No. 1's Investment in Qualcomm Stock in and After January 2000

#### a. Trial Court Decision

The Uzyels sought to recover damages for the depreciation in value of 80,000 shares of Trust No. 1's Qualcomm stock from January 2000 until Kadisha turned over the trust assets to them in September 2000. They argued that Kadisha's failure to protect their investment from price declines beginning in January 2000 was imprudent and that he held the shares rather than sell them in retaliation for this litigation against him.

The statement of decision stated that Kadisha breached his duty of prudent investing by failing to diversify Trust No. 1's assets and that he failed to sell the Qualcomm stock or take any measures to protect against a loss despite its precipitous decline in value in retaliation for the Uzyels' having sued him. The trial court found that Kadisha breached his duty to preserve the trust's assets by failing to take any action after the shares declined in value from $179.31 at the market closing on January 3, 2000, to $156.44 at the closing on January 5, 2000, and by failing to take any action thereafter. The court stated that Kadisha was a skilled investor who knew how to "collar" stock, employ a put option, place a stop-loss order, or take other measures to protect against a price decline.

The statement of decision stated further:

". . . Kadisha's failure to take advantage of any of the price increases [after January 5, 2000,] to minimize the beneficiaries' losses adds to the deplorability of his conduct rather than excusing it. It also supports [the Uzyels'] claim that he was intentionally retaliating against them for suing him. [¶] . . . [¶]

"Ordinarily, in cases where the trustee has acted in good faith and with undivided loyalty to the beneficiaries, courts are reluctant to second guess his investment decisions. Kadisha was not such a trustee. He never served the interests of the beneficiaries, and his retaliation against them for suing him is just another demonstration of his consistent and overwhelming bad faith."

The statement of decision, as modified on November 9, 2006, awarded the Uzyels $6,930,400 on this claim, calculated as the difference between the

amount the trust would have received if Kadisha had sold the 80,000 shares on January 5, 2000, and the value of the shares on September 18, 2000, when Kadisha turned over the shares to the Uzyels. The court also awarded prejudgment interest on that amount from September 19, 2000, but later in denying Kadisha's new trial motion modified the judgment by awarding no prejudgment interest on that amount.

### b. *Kadisha Has Shown No Error in the Award of Damages*

Kadisha contends Trust No. 1 realized a significant gain on the 80,000 shares, based on either their original purchase price or their value at the time the trust first took possession of the shares compared with their value on September 18, 2000, when he turned over the trust assets to the Uzyels.[34] He contends that gain precludes any liability for a loss based on the stock's interim value. He cites authorities for the proposition that an investment decision must be evaluated based on the investment's long-term performance and that the failure to sell an asset for what in hindsight is later determined to be a high intermediate market price is not imprudent.

The Pennsylvania intermediate appellate court in *Estate of Pew* (1994) 440 Pa.Super. 195, 240–242 [655 A.2d 521], cited by Kadisha, held that the propriety of the trustee's investment decision must be evaluated based on the long-term performance of the investment and that a short-term decline in value provided no basis for a surcharge when the overall long-term performance was strong. The trust held the stock for 60 years, and the stock had provided income during that period and had appreciated in value by a factor of five by the end of the period, despite a decline in value during the last three years of that period. (*Id.*, 655 A.2d at pp. 543–544.) *Estate of Pew* rejected the argument that the recent decline in value constituted a loss, stating: "it would be manifestly unfair of this Court to permit trust beneficiaries, armed with the twenty-twenty laser-like vision of hindsight, to focus in upon any short term time period during the course of the trust's administration when the price of the stocks forming the trust principal had declined as a basis for subjecting the trustees to a surcharge for failing to sell the stocks, when the overall long-term performance of the same stocks led to a five-fold growth in the value of the trust principal." (*Id.* at p. 544.)

---

[34] The trial court found that Kadisha sold 10,000 shares of Qualcomm stock from Trust No. 2 to Trust No. 1 in April 1999, but backdated the sale to October 8, 1998. The stock purchase agreement stated a purchase price of $39.13 per share, based on the market closing price on October 8, 1998, and provided that Trust No. 2 would retain ownership of the shares until the purchase price was paid in full. The shares were transferred from Trust No. 2 to Trust No. 1 on July 28, 1999. The market closing price on that date was $159.75. The shares numbered 20,000 at that time as a result of an intervening stock split, and the total value of the shares on that date was $3,195,000. The shares numbered 80,000 on September 18, 2000, as a result of another stock split, and the market closing price on that date was $69.81, so the total value of the shares on September 18, 2000, was $5,584,800.

■ The Restatement rule is similar. Section 213 of the Restatement Third of Trusts, Prudent Investor Rule provides that an investment loss resulting from a breach of trust should not be offset against a profit resulting from a separate and distinct breach of trust. But if the trust incurs a loss and also makes a profit as a result of breaches of trust that are not separate and distinct, the trustee's liability should be measured by the overall net performance of the investment, including both profits and losses resulting from what is essentially the same breach of trust. Section 213 states: "A trustee who is liable for a loss caused by a breach of trust may not reduce the amount of the liability by deducting the amount of a profit that accrued through another and distinct breach of trust; but if the breaches of trust are not separate and distinct, the trustee is accountable only for the net gain or chargeable only with the net loss resulting therefrom."

■ The comments to this section explain that if a trustee incurs a loss and also makes a profit as a result of breaches of trust that are not separate and distinct, the trustee is liable for the net loss calculated by reducing the loss by the amount of the profits. (Rest.3d Trusts, Prudent Investor Rule, § 213, coms. d & e, pp. 175 & 177.) Whether two or more breaches of trust are separate and distinct depends on factors such as:

"(1) Whether the breaches of trust are the result of a single policy, judgment, or set of interrelated decisions;

"(2) The amount of time elapsing between the breaches of trust; and

"(3) Whether, between the breaches of trust, the trustee had become aware of the earlier breach, and particularly of a resulting loss or profit.

"Also properly relevant to the law's treatment of multiple breaches may be such factors as:

"(4) Whether the trustee intended to misappropriate trust property, or intended to commit a breach of trust but not to misappropriate trust property, or had no intention to commit a breach of trust; and

"(5) Whether the profits and losses from the breaches of trust affect different beneficial interests differently in a way that would have inequitable consequences if gains were to be offset against losses." (Rest.3d Trusts, Prudent Investor Rule, § 213, com. f, pp. 178–179.)

Comment f states further that no definite rules can be stated as to the relative weight to be given to the different factors, and that "the distinction upon which these cases turn is justified primarily by concern that allowing

profits to be offset against losses may have a tendency to encourage multiple breaches of trust." (Rest.3d Trusts, Prudent Investor Rule, § 213, com. f, p. 179.)

The trial court found that Trust No. 1 initially purchased the Qualcomm stock (then 10,000 shares) from Trust No. 2 in April 1999. The aggregate value of the shares on that date was approximately $2 million. The evidence suggests that the Qualcomm stock then constituted more than one-third of the value of Trust No. 1's assets and that a lack of diversification arose immediately upon Trust No. 1's initial purchase of the stock, although the trial court made no express findings on these issues.[35] If Kadisha breached his duty of prudent investing by failing to diversify the trust's assets upon Trust No. 1's initial purchase of the stock in April 1999, such a breach of trust would be closely related to the failure to diversify the trust's assets in January 2000 and thereafter. This, together with the relatively short period of time from the initial purchase in April 1999 to January 2000, would tend to show that the two breaches of trust were not separate and distinct and that Kadisha's liability should be limited to the net loss, if any, from the investment.[36]

Other circumstances, however, suggest that the breach of trust occurring in January 2000 and thereafter was separate and distinct from any prior breach of trust. The trial court found that Kadisha breached his duty of prudent investing not only by failing to diversify the trust's assets, but also by failing to take any measures to protect the principal at any time during a substantial decline in value beginning in January 2000. Despite the dramatic increase in the aggregate value of the shares from approximately $2 million upon Trust No. 1's acquisition of the shares in April 1999 to more than $14 million as of the market closing on January 3, 2000, Kadisha failed to take any measures to protect the principal from price declines. The court found that Kadisha was a skilled investor with the knowledge to employ measures such as a collar, a put option, a stop-loss order, or other measures to protect against a price decline. Kadisha does not contend there was no substantial evidence to support these findings.

We believe that Kadisha's awareness of the dramatic increase in the value of the stock from April 1999 to January 2000 distinguishes his failure to employ any of the means available to him to protect the investment in January 2000 or thereafter from his prior failure to diversify the trust's assets. Considering the factors set forth above, we conclude that the breach of trust

[35] According to Kadisha's accountings, the value of Trust No. 1's assets other than the Qualcomm stock was approximately $3 million as of December 31, 1998, and approximately $4.4 million as of December 31, 1999.

[36] The investment resulted in a net gain during this period, rather than a loss.

occurring in January 2000 and thereafter was separate and distinct from any prior breach of trust so as to justify holding him liable for the depreciation in value of the trust assets resulting from the later breach. In light of our conclusion, we need not decide whether substantial evidence supports the finding of retaliation.

Kadisha also cites *In re Pate's Estate* (1948) 84 N.Y.S.2d 853, affirmed (N.Y.App.Div. 1950) 276 A.D. 1008 [95 N.Y.S.2d 903], and other cases for the proposition that a trustee's investment decisions cannot be viewed in hindsight. Those cases are distinguishable because the trial court here found that Kadisha breached his duty to invest prudently based on contemporaneous events and information known to him at the time that he failed to protect the investment. Whether the decline in the market value of Qualcomm stock beginning in January 2000 should have caused Kadisha to take measures to protect the value of the trust's investment is a question of fact. The Uzyels' expert, Irwin Goldring, testified that a prudent trustee would have taken some measures to protect the value of the trust's assets in light of the falling market price. Kadisha has not shown that the trial court's finding in this regard was based on hindsight and has not otherwise shown a lack of substantial evidence to support that finding.

Kadisha also contends the award of damages is based on a finding that he had a duty to sell all of the shares on January 5, 2000, and argues that he had no such duty as a matter of law. We believe that this mischaracterizes the trial court's decision. The court did not find that Kadisha had a duty to sell the shares on January 5, 2000, and breached that duty by failing to sell the shares. Instead, the court found that Kadisha's failure to sell the shares on or after that date or take any measures to preserve the investment was a breach of his duty to invest prudently. Kadisha has shown no error in this finding.

7. *The Award of Damages Resulting from Kadisha's Use of Trust Funds to Pay for His Legal Defense Includes Excessive Prejudgment Interest*

 a. *Trial Court Decision*

The trial court found that Kadisha's taking of $500,000 from the trusts to pay his legal fees and his use of an additional $13,761 from Trust No. 2 for the same purpose were unauthorized and that Kadisha failed to return the $500,000 as ordered by the court. The court rejected Kadisha's argument that language in our prior opinion precluded an award of prejudgment interest on the $500,000 deposited in his attorney's trust account. The court stated that although we had stated in our opinion that "the return of $250,000 [to each trust] shall be deemed accomplished as of this date and the funds shall remain

on deposit in the bank account of the trustee's attorney," the Uzyels continued to be deprived of use of the funds and therefore were entitled to prejudgment interest. The court awarded the Uzyels $543,055 on this claim, including $500,000 with interest from February 23, 2000, until September 18, 2000, plus $13,761 with interest from January 13, 2000, until September 18, 2000, and also awarded 10 percent prejudgment interest on the $543,055 from September 19, 2000, until the entry of judgment.

### b. The Uzyels Are Not Entitled to Prejudgment Interest at the Legal Rate on the Deposited Funds After August 4, 2000

Kadisha contends our modification of the appealed orders to state that the return of the $500,000 "shall be deemed accomplished as of this date" compels the conclusion that those funds were deemed returned as of August 4, 2000, that the Uzyels are not entitled to prejudgment interest at the legal rate on those funds after that date, and that the only prejudgment interest that they are entitled to on those funds after August 4, 2000, is any interest that was actually earned on the deposited funds.[37]

The purpose of the parties' stipulation and our opinion was to provide Kadisha the same security that an undertaking would have provided, by ensuring that the funds would remain on deposit in his attorney's trust account except as authorized by the trial court, while relieving the Uzyels of the need to provide an undertaking. The Uzyels effectively used the deposited funds as an undertaking. We believe that by agreeing that the funds were deemed returned and accepting the benefits of this arrangement, the Uzyels necessarily waived the right to recover prejudgment interest at the legal rate on the deposited funds after August 4, 2000. They are entitled to recover the funds remaining in the attorney's trust account as of the date of entry of judgment, including any interest actually accrued on the deposited funds. The Uzyels also are entitled to prejudgment interest at the legal rate on the entire $500,000 from the date of its deposit, February 23, 2000, until August 4, 2000. Kadisha concedes that they also are entitled to recover the approximately $76,000 withdrawn from the attorney's trust account from March through July 2000. We agree and also conclude that they are entitled to prejudgment interest on the amount of each withdrawal from the date of the

---

[37] Contrary to the Uzyels' argument, the failure to move for a new trial on the ground of excessive damages does not preclude the contention on appeal that the award was legally erroneous, as Kadisha contends here. (*Christiansen v. Roddy* (1986) 186 Cal.App.3d 780, 789 [231 Cal.Rptr. 72].)

withdrawal until the entry of judgment, under Civil Code section 3287, subdivision (a) (discussed *post*).[38]

8. *The Uzyels Are Entitled to Prejudgment Interest on the Award of the Disgorgement of Profits Arising from Kadisha's Stock Purchase from Farahnik in May 1991*

a. *Trial Court Decision*

The trial court in its statement of decision awarded the Uzyels prejudgment interest from September 19, 2000, at the rate of 10 percent on the award of $15,818,000 in the disgorgement of profits arising from Kadisha's purchase of Qualcomm stock from Farahnik in May 1991. In denying Kadisha's new trial motion, the court modified the judgment by reducing the award of $15,818,000 to an amount to be determined based on the value of the shares on November 22, 1996, but did not modify the award of prejudgment interest on this claim. The court later reconsidered its ruling on the new trial motion, however, vacating the reduction of the award and denying prejudgment interest.

b. *The Order Denying Prejudgment Interest Is Void*

After timely denying the new trial motion and modifying the judgment pursuant to Code of Civil Procedure section 662 in the order of February 5, 2007, the trial court had no jurisdiction to reconsider and amend its modification of the judgment by denying prejudgment interest or to do so after the expiration of the 60-day period to rule on the new trial motion, for the reasons stated *ante*. The order of March 7, 2007, purporting to do so was void. The award of prejudgment interest therefore must be restored.[39]

9. *The Uzyels Are Entitled to Prejudgment Interest on the Award of Damages Resulting from the Sale of Trust No. 2's Qualcomm Stock in May 1992*

a. *Trial Court Decision*

The trial court in its statement of decision awarded the Uzyels prejudgment interest at the rate of 10 percent on the $35,389,242 in compensatory

---

[38] Kadisha does not challenge the award of $13,761, representing an additional amount paid from Trust No. 2 for attorney fees, plus prejudgment interest on that amount from January 13, 2000, until September 18, 2000.

[39] The Uzyels do not challenge the award of prejudgment interest on the amount awarded on this claim from September 19, 2000, rather than September 18, 2000, and therefore abandon any claim of error in this regard.

damages arising from the sale of Trust No. 2's Qualcomm stock in May 1992. In denying Kadisha's new trial motion, however, the court modified the judgment by denying prejudgment interest on the award. The court later explained that it had denied prejudgment interest in equity so as to avoid "an undue penalty."

> b. *The Uzyels Are Entitled to Prejudgment Interest on the Award Under Civil Code Section 3287, Subdivision (a)*

The Uzyels contend they are entitled to prejudgment interest on the award under Civil Code section 3287, subdivision (a) because the amount of damages was "capable of being made certain by calculation" (*ibid.*) on September 18, 2000.

Civil Code section 3287, subdivision (a) provides that a party is entitled to recover prejudgment interest on an amount awarded as damages from the date that the amount was both (1) due and owing and (2) certain or capable of being made certain by calculation. (*Koyer v. Detroit F. & M. Ins. Co.* (1937) 9 Cal.2d 336, 345 [70 P.2d 927]; *Gray v. Bekins* (1921) 186 Cal. 389, 399 [199 P. 767]; see also Rest.2d Contracts, § 354, subd. (1).) The primary purpose of an award of prejudgment interest is to compensate the plaintiff for the loss of use of money during the period before the entry of judgment, in order to make the plaintiff whole. (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 663 [25 Cal.Rptr.2d 109, 863 P.2d 179]; *Lewis C. Nelson & Sons, Inc. v. Clovis Unified School Dist.* (2001) 90 Cal.App.4th 64, 71–72 [108 Cal.Rptr.2d 715].)

Damages are certain or capable of being made certain by calculation, or ascertainable, for purposes of Civil Code section 3287, subdivision (a) if the defendant actually knows the amount of damages or could compute that amount from information reasonably available to the defendant. (*KGM Harvesting Co. v. Fresh Network* (1995) 36 Cal.App.4th 376, 391 [42 Cal.Rptr.2d 286].) A readily ascertainable market value can satisfy this requirement. (*Cassinos v. Union Oil Co.* (1993) 14 Cal.App.4th 1770, 1789 [18 Cal.Rptr.2d 574].) In contrast, damages that must be judicially determined based on conflicting evidence are not ascertainable. (*Lineman v. Schmid* (1948) 32 Cal.2d 204, 212 [195 P.2d 408]; *Fireman's Fund Ins. Co. v. Allstate Ins. Co.* (1991) 234 Cal.App.3d 1154, 1172–1173 [286 Cal.Rptr. 146].) A legal dispute concerning the defendant's liability or uncertainty concerning the measure of damages does not render damages unascertainable. (*Olson v. Cory* (1983) 35 Cal.3d 390, 402 [197 Cal.Rptr. 843, 673 P.2d 720]; *Shell Oil Co. v. National Union Fire Ins. Co.* (1996) 44 Cal.App.4th 1633, 1651 [52 Cal.Rptr.2d 580].) On appeal, we independently determine whether damages are ascertainable for purposes of the statute. (*KGM Harvesting Co., supra*, 36 Cal.App.4th at pp. 390–391.)

The trial court calculated damages on this claim as the difference between the market value of 600,000 shares of Qualcomm stock at the time of the termination of the trusts (based on their lowest market price between Sept. 14 and 18, 2000) and the value of the proceeds of the sale of 37,500 shares in May 1992 ($801,000) augmented by interest on those proceeds from the date of the sale until September 18, 2000. Both the market value of 600,000 shares at the time of the trusts' termination and the value of the sale proceeds were ascertainable by Kadisha on September 18, 2000. We conclude that the Uzyels are entitled to prejudgment interest on the damages award pursuant to Civil Code section 3287, subdivision (a), from September 18, 2000.[40] In light of our conclusion, we need not address their alternative argument that they are entitled to prejudgment interest under Civil Code section 3288.

We reject Kadisha's argument that discrepancies between the damages awarded by the court and amounts previously stated by the Uzyels in interrogatory responses or requested at trial compel the conclusion that the damages were not ascertainable. A large discrepancy between the amount demanded and the amount awarded indicates that damages were not ascertainable if the discrepancy results from the resolution of factual disputes arising from conflicting evidence or the lack of factual information needed to readily calculate damages. (*Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 961–962 [57 Cal.Rptr.2d 141]; *Polster, Inc. v. Swing* (1985) 164 Cal.App.3d 427, 435–436 [210 Cal.Rptr. 567].) That was not the case here.

*Conderback, Inc. v. Standard Oil Co.* (1966) 239 Cal.App.2d 664 [48 Cal.Rptr. 901], cited by Kadisha, is distinguishable. The calculation of damages accepted by the jury in that case involved the "application of a pricing formula and negotiations between the parties, all in accordance with a prior course of dealing" (*id.* at p. 690), apparently requiring the resolution of factual disputes. Moreover, *Conderback* stated that the invoices and other records provided to the defendant failed to provide sufficient information to enable the defendant to ascertain the exact amount due. (*Id.* at pp. 690–691.) Here, in contrast, the amount due could be computed from information reasonably available to Kadisha, as we have stated.

The Uzyels cite no authority and offer no argument in support of awarding prejudgment interest at the rate of 10 percent, as requested in their opening brief on appeal. The proper rate of prejudgment interest awardable under Civil Code section 3287, subdivision (a) in these circumstances is 7 percent. (Cal.

---

[40] Prejudgment interest began to accrue on the date that the damages first became certain or capable of being made certain by calculation. (Civ. Code, § 3287, subd. (a) ["... is entitled also to recover interest thereon from that day"].) Prejudgment interest on the damages awarded on this claim therefore began to accrue on September 18, 2000.

Const., art. XV, § 1; *Continental Airlines, Inc. v. McDonnell Douglas Corp.* (1989) 216 Cal.App.3d 388, 434 [264 Cal.Rptr. 779].)

### c. *Section 16440, Subdivision (a)(3) Does Not Preclude Prejudgment Interest*

Kadisha argues that section 16440, subdivision (a) describes the circumstances in which prejudgment interest on a monetary award for breach of trust is, and is not, available. He argues that the inclusion of the words "with interest" in subdivision (a)(1) and (2), contrasted with the absence of those words in subdivision (a)(3), indicates that prejudgment interest is not available under subdivision (a)(3) on an award of damages for lost profits to the trust estate resulting from a breach of trust.

Section 16440, subdivision (a) expressly provides for prejudgment interest on an award of "[a]ny loss or depreciation in value of the trust estate resulting from the breach of trust" or "[a]ny profit made by the trustee through the breach of trust." (*Id.*, subd. (a)(1) & (2).) Subdivision (a)(3), however, authorizes an award of "[a]ny profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust," with no mention of interest. Section 16442 states that the provisions for a trustee's liability for breach of trust under sections 16440 and 16441 do not preclude any other remedy available under the statutory or common law.

Section 16441, subdivision (a) states that if the trustee is liable for interest pursuant to section 16440, the interest rate is the greater of the legal rate of interest on judgments at the time or the amount of interest actually received.[41] The legal rate of interest on judgments is 10 percent. (Code Civ. Proc., § 685.010, subd. (a).) The legal rate of interest on an obligation before the entry of judgment is 7 percent, unless otherwise specified by statute. (Cal. Const., art. XV, § 1; *Continental Airlines, Inc. v. McDonnell Douglas Corp., supra*, 216 Cal.App.3d at p. 434.) Thus, one effect of the express provision for interest on an award authorized by section 16440, subdivision (a)(1) or (2) is to ensure that the prejudgment interest rate on such an award is 10 percent rather than 7 percent. Moreover, subdivision (a)(1) and (2) authorize prejudgment interest on such an award without the need to show that the amount was certain or capable of being made certain by calculation, as would be required under Civil Code section 3287, subdivision (a).

---

[41] Section 16441 states: "(a) If the trustee is liable for interest pursuant to Section 16440, the trustee is liable for the greater of the following amounts: [¶] (1) The amount of interest that accrues at the legal rate on judgments in effect during the period when the interest accrued. [¶] (2) The amount of interest actually received. [¶] (b) If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

In light of section 16442, and considering the differences between an award of prejudgment interest under section 16440, subdivision (a) and an award of prejudgment interest under Civil Code section 3287, subdivision (a), we conclude that the omission of the words "with interest" in section 16440, subdivision (a)(3) was not intended to, and does not, preclude an award of prejudgment interest under Civil Code section 3287, subdivision (a).

> 10. *The Uzyels Are Entitled to Prejudgment Interest on the Award of Damages Resulting from the Failure to Protect the Value of Trust No. 1's Investment in Qualcomm Stock in and After January 2000*

### a. *Trial Court Decision*

The trial court in its statement of decision, as modified on November 9, 2007, awarded the Uzyels prejudgment interest at the rate of 10 percent on the $6,930,400 in compensatory damages arising from Kadisha's failure to protect the value of Trust No. 1's investment in Qualcomm stock in and after January 2000. In denying Kadisha's new trial motion, however, the court modified the judgment by denying prejudgment interest on the award. The court later explained that it had denied prejudgment interest in equity so as to avoid "an undue penalty."

> ### b. *The Uzyels Are Entitled to Prejudgment Interest on the Award Under Section 16440, Subdivision (a)(1)*

The Uzyels contend they are entitled to prejudgment interest on the award under section 16440, subdivision (a)(1). They argue that the damages are for the loss or depreciation in value of the trust estate resulting from a breach of trust, as described in the statute, and that prejudgment interest is mandatory on such an award absent grounds to excuse the trustee from liability, in whole or in part, pursuant to subdivision (b).

Section 16440, subdivision (a)(1) authorizes an award of "[a]ny loss or depreciation in value of the trust estate resulting from the breach of trust, *with interest*." (Italics added.) The plain statutory language suggests that an award of damages under this provision must include prejudgment interest. The legislative history supports this interpretation. The California Law Revision Commission's report to the Legislature recommending the trust law stated that the proposed law would establish "a uniform rule that the trustee is liable for interest in any case where there is a breach resulting in a loss or depreciation of the trust estate or in profit to the trustee." (Recommendation

Proposing the Trust Law (Dec. 1985) 18 Cal. Law Revision Com. Rep., *supra*, pp. 560–561.) Moreover, the reference in section 16441 to a trustee's "liab[ility] for interest pursuant to Section 16440" also suggests that section 16440 establishes a trustee's liability for interest and does not merely refer to liability established under some other statute, as Kadisha argues.

We conclude that the award of $6,930,400 in damages arising from Kadisha's failure to protect the value of Trust No. 1's investment in Qualcomm stock in and after January 2000 is an award of damages for the depreciation in value of the trust estate resulting from a breach of trust (§ 16440, subd. (a)(1)) and that the Uzyels are entitled to prejudgment interest on the award at the rate of 10 percent (§ 16441, subd. (a)), from September 18, 2000, pursuant to section 16440, subdivision (a)(1).[42] In light of our conclusion, we need not address the Uzyels' alternative argument that they are entitled to prejudgment interest under Civil Code section 3288.

11. *The Parties Have Shown No Error in the Punitive Damages Award*

Kadisha contends the award of $5 million in punitive damages will be constitutionally excessive if he successfully obtains the reversal of all of the compensatory damages and monetary awards that he challenges on appeal. We need not address this contention further because its predicate has not occurred, and the compensatory award will far exceed the amount of punitive damages awarded.

The Uzyels contend the award of punitive damages is inadequate as a matter of law under California law because, considering the reprehensibility of Kadisha's conduct, the amount of the compensatory award, and Kadisha's wealth, the $5 million punitive damages award is inadequate to serve the purposes of punishment and deterrence as a matter of law. We disagree.

A plaintiff is never entitled to punitive damages as a matter of right. (*Brewer v. Second Baptist Church* (1948) 32 Cal.2d 791, 800–801 [197 P.2d 713] (*Brewer*).) Whether to award punitive damages if the requirements of

---

[42] In our view, prejudgment interest under section 16440, subdivision (a)(1) begins to accrue on the date of the loss or depreciation in value, rather than on the following day. The Uzyels do not challenge the award of prejudgment interest from September 19, 2000, on other amounts awarded in the judgment and therefore abandon any claim of error in this regard as to those other awards.

Civil Code section 3294, subdivision (a) are satisfied and the amount of such an award are questions committed to the trier of fact. (*Brewer, supra,* at pp. 800–801; *Hannon Engineering, Inc. v. Reim* (1981) 126 Cal.App.3d 415, 431 [179 Cal.Rptr. 78].) Accordingly, we conclude that the Uzyels cannot show that the award is legally inadequate.

The Uzyels also argue that any increase in the compensatory award, including prejudgment interest, will require a reversal and redetermination of the award of punitive damages. We likewise disagree with that contention. If the reversal of part of a compensatory award renders the punitive damages excessive, the award of punitive damages should be reversed for a redetermination of punitive damages in light of the reduced compensatory award. (*Ramona Manor Convalescent Hospital v. Care Enterprises* (1986) 177 Cal.App.3d 1120, 1140 [225 Cal.Rptr. 120].) The reason for this is to ensure a reasonable relationship between the compensatory award and the amount of punitive damages. (*Ibid.*) If an appeal results in an increase in the compensatory award, however, the plaintiff is not entitled to a reversal of the punitive damages award to keep pace with that increase. "The rule that exemplary damages must bear a reasonable relation to actual damages [citations] is designed solely to guard against excessive punitive damages. [Citation.]" (*Brewer, supra,* 32 Cal.2d at p. 802; accord, *Torres v. Automobile Club of So. California* (1997) 15 Cal.4th 771, 781 [63 Cal.Rptr.2d 859, 937 P.2d 290].) Absent a showing of error in the award of punitive damages, we conclude that any increase in the compensatory award as a result of this appeal cannot justify a reversal of the punitive damages award.

### 12. *The Attorney Fee Award Was Unauthorized*

#### a. *Trial Court Decision*

The trial court awarded the Uzyels $13,364,530 in attorney fees under section 17211, subdivision (b), which provides for an award of attorney fees and litigation expenses in favor of a beneficiary who contests the trustee's account if the court determines that the trustee's opposition to the contest was "without reasonable cause and in bad faith." Section 17211, subdivision (b) states: "If a beneficiary contests the trustee's account and the court determines that the trustee's opposition to the contest was without reasonable cause and in bad faith, the court may award the contestant the costs of the contestant and other expenses and costs of litigation, including attorney's fees, incurred to contest the account. The amount awarded shall be a charge against the compensation or other interest of the trustee in the trust. The

trustee shall be personally liable and on the bond, if any, for any amount that remains unsatisfied."[43]

The trial court concluded that this proceeding involved a contest of an account within the meaning of the statute.[44] The court stated further that Kadisha had reasonable cause to oppose the contest only if a reasonable attorney knowing the facts known to Kadisha at the time of his opposition would have believed that his opposition to each claim was legally tenable.

The trial court found that at the time he opposed the Uzyels' claims in this litigation, Kadisha knew the pertinent facts relating to his misappropriations of trust funds, his preparation of "fraudulent accountings" to conceal his misappropriations, his failure to administer the trusts in the interests of the beneficiaries, his failure to invest prudently, and other misconduct. The court stated that Kadisha also knew that to prevent the court from discovering his wrongdoings, he would have to commit and suborn perjury. The court concluded that no reasonable attorney knowing those facts would have believed that Kadisha could be exonerated if the facts were presented in a truthful manner. The statement of decision stated: "No reasonable attorney could believe that presenting the facts outlined above in a way that is consistent with the truth could result in Kadisha's exoneration on any legal ground. And no reasonable attorney could have put Kadisha and his witnesses on the stand knowing that they would have to give untrue testimony (as they did) in order to provide a defense. In addition, a reasonable attorney would have known that if the Court did not believe Kadisha or his witnesses, it could disregard all of their testimony (as the Court has done), and that, as a result, Kadisha would have no evidence to support his opposition. In short, no reasonable attorney could have believed that an opposition based on false testimony was legally tenable. [¶] Since no reasonable attorney would have thought Kadisha's opposition legally tenable, the Court finds that Kadisha's opposition was unreasonable."

The trial court also found that Kadisha had opposed the contest in bad faith because he conducted his defense primarily for an improper purpose.

[43] Section 17211 also provides for an award of attorney fees and litigation expenses in favor of the trustee if the court determines that a beneficiary's contest of the trustee's account was "without reasonable cause and in bad faith." (*Id.*, subd. (a).)

[44] Kadisha did not challenge this ruling in his appellate briefs. He argued in a letter submitted to this court shortly before oral argument that the trial court had no authority to award attorney fees under section 17211, subdivision (b) because this proceeding did not involve a contest of a trustee's account, citing *Soria v. Soria* (2010) 185 Cal.App.4th 780 [111 Cal.Rptr.3d 91] and distinguishing *Leader v. Cords* (2010) 182 Cal.App.4th 1588 [107 Cal.Rptr.3d 505]. We need not decide whether to exercise our discretion to consider this belated argument because we conclude that the award was unauthorized for another reason. Accordingly, we express no opinion as to whether section 17211 could apply in these circumstances.

### b. *Kadisha Had Reasonable Cause to Defend This Litigation*

Kadisha contends the Uzyels are not entitled to an award of attorney fees under section 17211, subdivision (b) because his opposition to their claims was not "without reasonable cause." He argues that a trustee's opposition to a beneficiary's contest of an account is "without reasonable cause" only if no reasonable attorney would have opposed the contest. He also argues that he successfully defended several claims seeking, in aggregate, more money than the Uzyels were awarded on their successful claims.

■■■ Section 17211, subdivision (b) authorizes an award of attorney fees and litigation expenses in favor of a beneficiary who contests the trustee's account if the trustee's opposition to the contest was "without reasonable cause and in bad faith."[45] (§ 17211, subd. (b).) "Reasonable cause," when used with reference to the prosecution of a claim, ordinarily is synonymous with "probable cause" as used in the malicious prosecution context.[46] (*Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 857 [80 Cal.Rptr.2d 803, 968 P.2d 514] (*Kobzoff*) [construing "reasonable cause" in Code Civ. Proc., § 1038, subd. (a)].)

"Probable cause" to prosecute an action means an objectively reasonable belief that the action is legally tenable. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 292 [46 Cal.Rptr.3d 638, 139 P.3d 30].) There is no probable cause to prosecute an action only if no reasonable attorney would believe that the action had any merit and any reasonable attorney would agree that the action was totally and completely without merit. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 743, fn. 13 [3 Cal.Rptr.3d 636, 74 P.3d 737]; *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 817 [123 Cal.Rptr.2d 19, 50 P.3d 733].) The probable cause determination is objective and is based on the facts known to the malicious prosecution defendant at the time the action was initiated or prosecuted.[47]

---

[45] The same language, "without reasonable cause and in bad faith," is also found in other Probate Code sections providing for an award of attorney fees and litigation expenses in connection with objections to accounts by other fiduciaries. (§§ 2622.5 [guardianship and conservatorship accounts], 11003 [accounts by the personal representative of a decedent's estate].)

[46] "Reasonable cause" may have a different meaning in other contexts where the term has been defined by the Legislature. (See, e.g., former § 21306, subd. (b), amended by Stats. 2000, ch. 17, § 6, and repealed by Stats. 2008, ch. 174, §§ 1, 3.)

[47] In contrast, "bad faith" in this context concerns the trustee's subjective state of mind and cannot be inferred from the absence of probable cause alone. (Cf. *Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 498–499 [78 Cal.Rptr.2d 142] [discussing the "malice" element of malicious prosecution].)

(*Zamos v. Stroud* (2004) 32 Cal.4th 958, 971 [12 Cal.Rptr.3d 54, 87 P.3d 802].) Probable cause is a low threshold designed to protect a litigant's right to assert arguable legal claims even if the claims are extremely unlikely to succeed. (*Jarrow Formulas, supra*, 31 Cal.4th at pp. 742–743; *Wilson, supra*, 28 Cal.4th at p. 817.)

Whether there was probable cause to have prosecuted an action in light of the facts then known to the malicious prosecution defendant is a legal question for the court to decide. (*Wilson v. Parker, Covert & Chidester, supra*, 28 Cal.4th at p. 817; *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 875 [254 Cal.Rptr. 336, 765 P.2d 498].) Any controversy as to what facts were known to the malicious prosecution defendant at the time the action was initiated presents a question of fact for the trier of fact. (*Sheldon Appel, supra*, at p. 881.) If there is no dispute as to what facts were known or if the factual dispute is not material to the probable cause determination, the existence of probable cause is a pure question of law. (*Ibid.*)

■ The question here is the meaning of "reasonable cause" with reference to the defense, rather than the prosecution, of a proceeding. Contrary to the trial court, we believe that reasonable cause in this context does not require an objectively reasonable belief, based on the facts then known to the trustee, that the trustee would be completely exonerated. Instead, we believe that reasonable cause to oppose a contest of an account requires an objectively reasonable belief, based on the facts then known to the trustee, either that the claims are legally or factually unfounded or that the petitioner is not entitled to the requested remedies. Conversely, there would be no reasonable cause to oppose a contest of an account only if all reasonable attorneys would have agreed that the opposition was totally without merit, or, in other words, no reasonable attorney would have believed that the opposition had any merit. As with probable cause, we independently review the trial court's finding on the existence of reasonable cause absent any factual dispute as to Kadisha's knowledge at the time. (Cf. *Kobzoff, supra*, 19 Cal.4th at p. 857; but see *Guardianship of K.S.* (2009) 177 Cal.App.4th 1525, 1533 [100 Cal.Rptr.3d 78] [applying the abuse of discretion standard to findings under § 2622.5 that objections to an account were without reasonable cause and in bad faith].)

Kadisha successfully opposed several substantial claims in the trial court, including claims for the disgorgement of profits earned on shares that he purchased in August 1988 and September 1989, damages for the misappropriation of trust funds, lost profits resulting from the sale of Trust No. 2's

Qualcomm stock in April 1999, and other claims. His successful opposition to those claims shows that he had reasonable cause to oppose them. Moreover, the claims on which Kadisha did not avoid liability presented questions concerning the existence of liability, measure of damages, or amount of disgorgement that were at least arguable. Our review of the award of the disgorgement of profits arising from Kadisha's stock purchase from Farahnik in May 1991, the award of lost profits resulting from the sale of Trust No. 2's Qualcomm stock in May 1992, and the award of lost profits resulting from his failure to protect Trust No. 1's investment in Qualcomm stock in and after January 2000 has revealed substantial questions concerning the existence or amount of liability on those claims.[48] We conclude that Kadisha had reasonable cause to defend against the Uzyels' claims in this proceeding and that they are not entitled to an award of attorney fees under section 17211, subdivision (b).[49]

## DISPOSITION

The judgment is reversed as to (1) the award of the disgorgement of profits arising from Kadisha's stock purchase from Farahnik, with directions to award the Uzyels an amount based on the value of the shares on November 22, 1996, as set forth in the order of February 5, 2007; (2) the award of damages resulting from Kadisha's use of trust funds to pay for his legal defense, with directions to modify the award as stated *ante*; (3) the denial of prejudgment interest on the award of the disgorgement of profits arising from Kadisha's stock purchase from Farahnik in May 1991, with directions to modify the award by adding prejudgment interest from September 19, 2000, at the rate of 10 percent; (4) the denial of prejudgment interest on the award of damages resulting from the sale of Trust No. 2's Qualcomm stock in May 1992, with directions to modify the award by adding prejudgment interest from September 18, 2000, at the rate of 7 percent; (5) the denial of prejudgment interest on the award of lost profits resulting from the failure to sell Trust No. 1's Qualcomm stock in January 2000, with directions to modify the award by adding prejudgment interest from September 18, 2000, at the rate of 10 percent; and (6) the entitlement to an attorney fee award,

---

[48] We express no opinion concerning Kadisha's opposition to the claim for the disgorgement of profits arising from Kadisha's purchase of Trust No. 2's interest in Carson '93. Kadisha does not challenge that award on appeal. The Uzyels did not seek an apportionment of attorney fees, so we need not decide whether apportionment would be appropriate or whether Kadisha's opposition to the claim was "without reasonable cause and in bad faith" (§ 17211, subd. (b)).

[49] In light of our conclusion, we need not address Kadisha's contention that the attorney fee award is excessive or the Uzyels' contention that an award of "expenses and costs of litigation" under section 17211, subdivision (b) can include expenses that are not recoverable as costs under Code of Civil Procedure section 1033.5. The Uzyels have shown no error in the award of costs.

with directions to deny a fee award. The judgment is affirmed in all other respects. The order determining the amount of and awarding attorney fees is reversed. Kadisha's appeal from the order awarding costs is dismissed, and the order awarding costs is affirmed. Each party is to bear its own costs on appeal.

Klein, P. J., and Kitching, J., concurred.

A petition for a rehearing was denied September 22, 2010, and the petition of appellant Neil Kadisha for review by the Supreme Court was denied December 15, 2010, S187744.